STOREN, STATE TREASURER *v.* SEXTON, MARION COUNTY
TREASURER ET AL.

[No. 26,381. Filed March 5, 1936.]

590

*Philip Lutz, Jr.,* Attorney-General, *Joseph W. Hutchinson,* Assistant Attorney-General, *Joseph P. McNamara,* Deputy Attorney-General, *Frederick E. Matson, C. Severin Buschmann* and *Leo M. Gardner,* for appellant.

*Stuart & Stuart, Brenton A. De Vol, Cable G. Ball, Horace L. Hanna, William J. Peden, Frank Seidensticker, Robert K. Eby, Edward H. Knight, James E. Deery* and *Herbert M. Spencer,* for appellees.

FANSLER, J.—This action was brought by the treasurer of Marion county, as ex officio treasurer of the city of Indianapolis, and as ex officio treasurer of the board of school commissioners of the city of Indianapolis, to procure a declaratory judgment as to the constitutionality of, and, if constitutional, the effect of, "An act concerning a state sinking fund for public deposits and repealing all laws in conflict therewith." Acts 1932, ch. 33, p. 141.

A taxpayer of Marion county and of the city of Indianapolis, the holder of a bond issued by the board of sanitary commissioners of the sanitary district of Indianapolis, the owner of a bond issued by the board of school trustees of the school city of Indianapolis, the owner of a bond issued by the board of commissioners of Marion county for the construction of a highway, the owner of a bond issued by the board of park commissioners of the park district of Indianapolis, the owner of a bond issued by the board of commissioners of Marion county for refunding certain obligations, the owner of a bond of the city of Indianapolis payable out of the sinking fund of that city, the city of Indianapolis, William L. Elder, as controller of the city of Indianapolis, the owners of certain local public improvement (Barrett Law) bonds, the sinking fund commissioners of the city of Indianapolis, the board of sanitary commissioners of the city of Indianapolis, the board of park commissioners of the city of Indianapolis, the State Board of Finance, William P. Storen, as Treasurer of State, the board of commissioners of the county of Marion, the board of finance of Marion county, Pike township, the board of finance of Pike township, Pike school township, the school town of Speedway, the board of finance of the school town of Speedway, Philip Lutz, Jr., as Attorney General, and the trustees of Indiana University, were made defendants. The trustees of Pur-

due University were permitted to intervene and file an answer as defendant.

There was a trial, special findings of fact and conclusions of law, and a judgment in the form of a mandate, directing the various officers involved to cease and resist from paying into the depository sinking fund interest on depository deposits arising from special assessment district levies and trusts, and ordering such officers to pay into the fund interest on depository deposits of funds arising under general tax levies.

The judgment is not declaratory in form, as prayed, but is sufficient to indicate the court's interpretation of the statute. It is apparent that all parties are seeking an interpretation, and will follow such an interpretation without coercion.

Errors assigned question the constitutionality of the law as a whole, and in its application to various funds.

The statute creates a fund to be known as the "state sinking fund for public deposits," the purpose of which is "to secure the payment of all public funds deposited in any depository in this state under and pursuant to the terms and conditions of the 'public depository act of 1907, and all acts amendatory thereof and supplemental thereto.'" It provides that the interest to become due on all public funds in any depository, deposited under the terms of the act of 1907 and amendments thereto, shall be paid into the state treasury and kept in the fund created by the act until such fund shall have a minimum balance of $3,000,000, and that thereafter no further interest shall be paid into such fund, but shall go into the fund by which it was earned as before the passage of the act. There is a provision that whenever the balance in the fund shall be depleted to less than $2,500,000 the interest on public deposits shall be again paid into the fund until it reaches $3,000,000. It is provided that the funds shall be available for the payment

of any deposits of public funds in depositories which shall have failed or suspended payments, and that thereupon the fund shall be subrogated to the rights of the depositing units in the balances in the suspended or failed depository.

Prior to 1907 there was no statute regulating the deposit of public funds. The custodians of the funds were free to preserve the funds as they saw fit, by depositing in bank or otherwise. There was no provision for the payment of interest upon public balances, and no interest was collected. The act of 1907 provided for the selection of banks which should be known as public depositories. It required that all public officers, boards, and commissions should deposit public funds collected by them in a public depository where the funds were to remain until disbursed or invested as provided by law. As originally enacted, the Depository Law required that the depository secure the deposit by a personal bond in a sum not less than 25 per cent greater than the maximum of the public deposit, or a surety bond in a sum not less than the full amount of the maximum deposit, or collateral of a specified type equal to the maximum deposits. The depositories were required to pay interest on the deposits at the rate of 2, 2½ and 3 per cent., depending upon the length of time for which the deposit was made, and whether or not it was subject to check. The interest was computed upon daily balances. In 1909 the act was amended reducing the amount of the security required upon a personal bond to a sum equal to 60 per cent of the maximum, or a surety bond in a sum equal to 50 per cent of the amount of the funds, or collateral of a type specified equal to 50 per cent of the maximum deposit. In 1931 the act was amended again by providing that interest be computed upon the minimum balance on deposit for each monthly period, the interest to be paid on the last day of the year. It will be

seen that the first amendment reduced the burden upon the depository in respect to the security required, and that the second had the effect of materially reducing the amount of interest which was collécted. All of the interest collected was credited to the particular fund by which it was earned, and became a part thereof. The statute of 1932, providing for a sinking fund, repeals that part of the Depository Law which requires the depository to give bond or pledge securities guaranteeing the repayment of the deposited funds, and thus the burden upon the depository is again reduced. The evident purpose of the act of 1907 and its amendments is to secure a uniform method of preserving the public funds, and insuring their preservation, and at the same time make provision for the funds to earn some interest before they are applied to the payment of the expenses of government, or the public obligations, or invested as required by law.

When funds, public or private, are deposited in bank upon a general deposit, the relationship of debtor and creditor is created. In effect, the funds are loaned to the bank. In the absence of a statute authorizing it, no public agency has the right to loan the public funds. Before the passage of the act of 1907, unexpended and uninvested current funds in the hands of public officers, boards, and commissions, did not earn interest. It was not contemplated that such funds should be loaned to banks. The deposit of funds in bank is not generally considered an investment. In the case of public funds which are to be invested, or funds of private origin which are to be invested for a public use, where the character of the investment is not provided for by statute, or the instrument creating the trust, an vestment in bonds, mortgages, or other similar securities, is contemplated. The Public Depository Law has reference to, and is intended to provide for, the deposit

of funds only pending the time when they can be applied to the ultimate use for which they are designed. It requires the deposit in state depositories of all public funds. For the purposes of that law, and the law here under consideration, all funds impressed with a public interest, that is, funds raised by general taxation, or special levies upon special assessment districts, or the income from publicly-owned properties, or funds arising from private sources in the hands of public officers which are designed for public use, must be deemed public funds. The Depository Law exempts all public officers from liability for the loss of public funds which are deposited in public depositories pursuant to the terms of the law, and the funds therein referred to must be construed to include every fund that comes to such officers in their official capacity.

In determining the purpose and character of the Sinking Fund Act, it is proper to consider its historical background. For several years prior to 1932 the country was in a financial depression. Business was at a low ebb, millions were unemployed, bankruptcy was common, and shrinking values and inability of debtors to pay impaired the resources of banks and financial institutions, and, together with lack of public confidence, forced many of them to suspend business. Every such failure further embarrassed the depositors in such institutions. Governmental agencies were heavy depositors in many closed banks, and in some communities all of the public revenue was made unavailable for current governmental needs. Large amounts of taxes were delinquent. In many communities the governmental agencies were without funds with which to meet pay-rolls, and other current obligations, and maturities upon bonds. The security for public deposits under the Depository Law proved inadequate. In the few instances where collateral had been given as

security, liquidation was slow. Personal sureties, where they were not insolvent, had difficulty in raising money, and surety companies in many instances were unable to pay promptly, even where solvent, because of the difficulty of converting investments into cash. In this situation, the legislature, at the special session of 1932, enacted the State Sinking Fund for Public Deposits Act. In the light of its historical background, its purpose is clearly apparent. It is a mutual insurance project, designed to provide immediate funds in lieu of frozen deposits. Its purpose is to spread and equalize losses in the same manner that fire losses are spread and equalized by insurance. The provision for a $3,000,000 fund to be invested in highly liquid securities insures the availability of immediate cash for governmental purposes in lieu of deposits in public depositories made unavailable by reason of failure or insolvency.

That it is within the power of the legislature to provide for the safety of public funds, without regard to whether they are derived from taxation or otherwise, cannot be questioned. The legislature may provide that current funds shall not be deposited in bank, but that they be held in public treasuries without interest until they are appropriated to the purpose for which they are intended. It may provide that they shall be deposited in banks, fixing the interest which shall be paid. It may change the rate of interest, as conditions may suggest the necessity of such a change, or require the withdrawal of deposits previously made, if, in the judgment of the legislature, that may seem advisable for the safety of the fund. The Constitution does not require that public funds shall be deposited in bank, nor that, if deposited, they shall earn interest. Those matters lie within the legislative discretion, and that discretion cannot be controlled by the courts. It is said in one of the briefs that the act "attempts to make the

public liable for funds lost in a bank by diverting interest on public funds to pay the debts of persons or person who has diverted public funds to a private use." But this is not true. The obligation of the bank to pay the deposit is not extinguished. The sinking fund merely guarantees payment, advances the money immediately, and is subrogated to the claim against the bank. There is no diversion of funds for private use any more than the payment of fire insurance premiums upon a courthouse would be a diversion of public funds for a private use. It is said that the act "puts the burden of the debt on political divisions which do not create the debt, and relieves the political division which is responsible for the debt." This statement is not exactly clear. However, the act does that which all insurance does. It is assumed that all public depositories are sound, else they would not be selected as the recipient of public deposits. If it were known which depository would fail, or become insolvent, or in which funds would be frozen and made unavailable, the obvious and easy solution would be to withdraw the funds from such depositories. But, since it is not known where the loss may occur, all contribute a small amount to the fund out of which protection will flow to each upon whom the expected loss or inconvenience will fall.

It is contended that the act is in conflict with article 1, section 23, of the Constitution of Indiana, which provides that: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." In support of this contention, it is said that the act requires an additional levy in the sum of $3,000,000, which is not for a public debt, but is for obligations owing to the government by individuals or corporations. But this is not true. There is no tax levy. The act simply provides that

a part of the interest which it is made possible for current public funds to earn under the Depository Law shall be preserved in a pool for the purpose of protecting those funds from loss which might otherwise be sustained by reason of the fact that they are earning interest rather than reposing in the strong-boxes of the government. In no sense are the funds to be used in paying the obligation of any individual or corporation.

It is suggested that many units of government which sustain no loss are compelled to tax their citizens to make up the loss of other units of government. But, as pointed out, there is no tax involved. It is simply interest earnings, and the government is not required to risk the principal of the fund in order to earn interest, and if it is risked, the state may require that part of the compensation for the risk shall be set aside to insure the safety of the principal.

It is contended that the law is in conflict with article 1, section 21, of the Constitution of Indiana, which provides that: "No man's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered." But no man's property is taken, and, for the small amount of interest taken from each fund, there is compensation in the insurance against loss.

It is said that the police power may be exerted only upon behalf of some public interest as distinguished from the interests of individuals or classes, and that it is not to be invoked to protect one class of citizens against another class, unless such interference is for the real protection of society in general. But there is a clear public interest in preserving all of the public funds. There is nothing in the law that looks to the protection of individuals or classes. The purpose of the law is the protection of all of the units of govern-

ment, and all current funds designed for public use, and this is a protection of society in general.

The act provides that, when any depository shall have failed or gone into voluntary liquidation, or for any other reason shall have suspended the payment of deposits, the amount of the several public deposits therein shall be ascertained and fixed by the person or persons, agent or agency, in charge of such depository, and such amounts of public deposits so ascertained and fixed shall be certified to the Attorney General and the Auditor of State. Upon the receipt of such statements, the Attorney General and Auditor are required to ascertain and determine the amount of public deposits in the depository, and send a copy of their decision to the governmental agency to whom the money is due, and to the person or persons, or agency, in charge of the closed depository. It is provided that such decision shall be published in a newspaper of general circulation in the county where the bank is situated, by one insertion, under the heading "notice to depositors," and that such decision of the Attorney General and Auditor shall be final, and shall have the same force and effect as an order of court, except as to such depositors as shall make objections thereto in writing to the Auditor of State. If there are objections, the matter shall be presented on petition of the person or persons, agent or agency, in charge of the closed depository, to the court having jurisdiction of the liquidation of the depository, or to any court of competent jurisdiction in the county in which the closed depository is situated, for determination as to the amount that is due. It is contended that this provision vests judicial powers in the Attorney General and Auditor of State, ministerial officers, contrary to the provisions of article 3, section 1, of the Constitution of Indiana. But this contention cannot be sustained. The Attorney General and Auditor

act merely as an auditing committee on behalf of the state. If the other parties in interest acquiesce in their audit, the question is settled as by agreement. If they do not acquiesce, it is submitted to a court for judicial determination. The procedure is similar to that involving claims against a county.

Appellees who are owners of Barrett Law, municipal sinking fund, municipal water works, and other bonds and obligations issued under statutes which provide for payment out of revenue derived from levies in special assessment districts, or the operation of publicly-owned utilities, assert that the law is unconstitutional because it violates the Fourteenth Amendment of the Constitution of the United States by taking their property without due process of law, and section 21 of article 1 of the Constitution of Indiana, which protects against taking property of the individual without compensation, and section 10 of article 1 of the Constitution of the United States, and section 24 of article 1 of the Constitution of Indiana, which protect against the impairment of the obligations of contracts. The statutes under which the several securities were issued provide that certain revenue shall constitute a special fund which shall be set aside for their payment. Some of the statutes provide that the public officers having the funds in charge shall invest the money in the fund in certain specified securities for the benefit of the holders of the obligations pending their maturity. In some statutes it is expressly provided that current funds shall be deposited as other public funds, and in some statutes there are express provisions for depositing current funds in banks which will pay the highest rate of interest. It is clear, however, that, while the funds thus received by the public officer must be devoted to the express purpose provided by statute, the funds still belong to the public until they

are paid to the bondholders. The public has the obligation of protecting these funds. It is true that the statutes providing for the bond issues must be read into the bond and be deemed a part of the contract. But the statutes providing for the manner in which public funds are deposited, and the interest rate which depositories are to pay upon public funds, including funds for the redemption of the bonds in question, cannot be deemed to be a part of the contract of the bondholders so that the legislature may not change the method of selecting depositories or the amount of interest which will be received upon such current deposits. The contract and bond require that the money collected shall be applied to the payment of the bond, and that any interest collected upon that money shall be set aside and devoted to the same purpose. But it cannot be deemed to have been within the understanding of the parties that the statutes bound the legislature to deposit such funds in banks regardless of safety or changed conditions. When the statutes are read together it is clear that it was intended that the funds so collected should be preserved and deposited in the same manner in which other public funds are preserved and deposited, and that if they yield interest, as other public funds, that interest shall be set aside as part of the funds for the payment of the bonds. The statutes must be construed as reserving in the legislature an implied discretion to accept such various rates of interest as may from time to time be consistent with safety, and to withhold deposits entirely from unsafe institutions, thus possibly foregoing interest. Formerly, under the Depository Law, the depositories were required to give bond guaranteeing the deposits. This was a burden which, no doubt, influenced the rate of interest. The amount and quality of security for a loan generally, if not always, influences the amount of interest it will yield. Under the Sinking Fund Law all of the

interest derived from current funds is not diverted to the insurance pool, but only so much as will be sufficient in the legislative judgment to create a pool which will guarantee the safety of the principal of all funds held by public agencies. After that is raised there will be no further deductions from interest. The fund so raised inures to the benefit of all contributing funds. It is not raised at the expense of any particular class of revenue, for the benefit of any other particular class, but by a system of contribution from all classes of revenue, for the benefit of all classes of revenue, which, on its face, apparently spreads the burdens and benefits with approximate equality.

Appellees rely upon the case of *City of Indianapolis et al.* v. *Robison* (1917), 186 Ind. 660, 117 N. E. 861, in which a statute is held unconstitutional and in violation of section 10 of article 1 of the Constitution of the United States, and of section 24 of article 1 of the Constitution of Indiana, for the reason that it sought to repeal a statute under which bonds were issued, and which gave the bondholders a lien upon the real estate benefited by an improvement, and substitute therefor as security a fund in the possession of the city to be invested in securities to be selected by the city, and which postponed the time of payment. It is said in the opinion: "A fair statement of the rule applicable to this class of cases as established by the authorities, is that any change of the law embodied in the contract, as here, which will substantially postpone, obstruct or retard its enforcement, or lessen its value, whether the change relates to its validity, construction, duration or discharge, impairs its obligation." The basis of the decision is indicated by this language: "Upon a careful consideration of the issues and evidence before us, we are convinced that the act of 1915, *supra,* added substantial, additional terms, risks and delay in settlement

of the contracts not contemplated when they were originally executed."

It was said in *Home Building & Loan Association* v. *Blaisdell et al.* (1934), 290 U. S. 398, 54 S. Ct. Rep. 231, that the constitutional prohibition against the impairment of the obligation of contracts is not to be applied with literal exactness, but that it is one of the broad clauses of the Constitution. That (p. 434) :

"Not only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.' *Stephenson* v. *Binford,* 287 U. S. 251, 276. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this court. . . .

" 'But into all contracts, whether made between States and individuals, or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the pre-existing and higher authority of the laws of nature, of nations or of the community to which the parties belong; they are always presumed, and must be presumed, to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipu-

lation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur.' "

The opinion quotes with approval from *Manigault* v. *Springs* (1905), 199 U. S. 473, 26 S. Ct. Rep. 127, as follows (p. 480) : "It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals."

But it cannot be said that this insurance scheme necessarily works an injury upon the bondholders, or that it will substantially postpone, obstruct, or retard the enforcement of, or lessen the value of, the bond. It may, in fact, be a benefit if the depository in which the funds are deposited should become insolvent, or fail, or suspend business. Every argument advanced here might as well be advanced against a statute reducing the rate of interest which public depositories shall be required to pay, or reducing the amount of the security which depositories were required to give under the Depository Law of 1907 and its amendments. The principle is the same.

Nor is there any taking of private property for a public or private use, or without compensation. There is merely management, the exercise of a discretion which assumes the wisdom of foregoing temporary interest earnings in the interest of

ultimate safety of principal, and the ultimate opportunity to earn interest with safety, and there is a benefit to the fund, an insurance protection, which is of some value, and hence some compensation.

But, even if the law had the effect of working a small dimunition in property value, it would not necessarily be condemned on that account by the constitutional provisions relied upon.

The case of *Noble State Bank* v. *Haskell* (1911), 219 U. S. 104, 31 S. Ct. Rep. 186, 32 L. R. A. (N. S.) 1062, involved the constitutionality of a statute of the state of Oklahoma, which levied an assessment of one per cent of its deposits upon every bank existing under the law of that state, for the purpose of creating a Depositors' Guaranty Fund. It will be noted that the assessment was against the banks for the benefit of their depositors, and not upon the depositors for their own mutual benefit, and that therefore there was, in fact, a taking of the money of the bank for the benefit of other private persons. The bank contended that it was solvent, and did not want the benefit of any of the guaranty fund, and asserted that it could not be called upon to contribute towards securing or paying the depositors in other banks consistently with article 1, section 10, and the Fourteenth Amendment of the Constitution of the United States. The court, in its opinion by Mr. Justice Holmes, said (p. 110) :

"In answering that question we must be cautious about pressing the broad words of the Fourteenth Amendment to a drily logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guarantees in the Bill of Rights. They more or less limit the liberty of the individual or they diminish property to a certain extent. We have few scientifically certain cri-

teria of legislation, and as it often is difficult to mark the line where what is called the police power of the States is limited by the Constitution of the United States, judges should be slow to read into the latter a *nolumus mutare* as against the law-making power.

"The substance of the plaintiff's argument is that the assessment takes private property for private use without compensation. And while we should assume that the plaintiff would retain a reversionary interest in its contribution to the fund so as to be entitled to a return to what remained of it if the purpose were given up (see *Receiver of Danbury Bank* v. *State Treasurer,* 39 Vermont 92, 98), still there is no denying that by this law a portion of its property might be taken with-out return to pay debts of a failing rival in business. Nevertheless, notwithstanding the logical form of the objection, there are more powerful considerations on the other side. In the first place it is established by a series of cases that an ulterior public advantage may justify a comparatively insignificant taking of private property for what, in its immediate purpose, is a private use. *Clark* v. *Nash,* 198 U. S. 361; *Strickley* v. *Highland Boy Mining Co.,* 200 U. S. 527, 531; *Offield* v. *New York, New Haven & Hartford R. R. Co.,* 203 U. S. 372; *Bacon* v. *Walker,* 204 U. S. 311, 315. And in the next, it would seem that there may be other cases besides the everyday one of taxation, in which the share of each party in the benefit of a scheme of mutual protection is sufficient compensation for the correlative burden that it is compelled to assume. See *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190. At least, if we have a case within the reasonable exercise of the police power as above explained, no more need be said.

"It may be said in a general way that the police power extends to all the great public needs. *Camfield* v. *United States,* 167 U. S. 518. It may be put forth in aid of

what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare. . . ."

In *Abie State Bank* v. *Bryan, Governor, etc. et al.* (1931), 282 U. S. 765, 51 S. Ct. Rep. 252, the court had under consideration a statute of the state of Nebraska assessing banks for the benefit of a fund for the protection of depositors. It was there held, as in the case above quoted from, that such a law, if not unreasonable and confiscatory, is not in conflict with the Fourteenth Amendment; that it is a police regulation within the scope of legislative power, and that a change in the amount of the assessment against the bank, and in favor of the guaranty fund, did not impair the obligation of the contract between the depositor and the bank, although the deposit was made when the law required a larger assessment, and hence greater security for the depositor, since contribution to the fund was but a police regulation, the sanction of which lay in the constitutional power of the state and not in contract. The court said: "We see no reason to doubt the power of the legislature to extricate the banks and the administration of the guaranty fund from the serious plight in which they were found under the operation of the old plan and to exercise a reasonable discretion in seeking this result."

The revenue raised for the payment of public bonds belongs to the public until it is applied to the payment, notwithstanding it cannot be used for other purposes; and the public has an interest in safeguarding and protecting such revenue, in making it promptly available for the purpose of meeting the obligations when they mature, not only because the various subdivisions of the state in which the revenue is raised may be responsible in case of loss, but because the public credit is involved.

Even if these funds were held in trust by a private trustee for the benefit of the bondholders, a certain discretion would vest in the trustee respecting the deposit and preservation of current funds, notwithstanding express provisions in the trust instrument. The trustee would not be required to deposit the funds in a bank expressly specified as the depository if he knew that the bank had become insolvent and the funds would be lost or jeopardized. Discretion in emergency must vest somewhere. The holders of a negligible amount of bonds of various types are represented by parties to this action. The great mass of interested bondholders are not parties. So far as may be known, they may highly approve this measure as desirable and designed to protect their ultimate interests. The communities which provide the funds are interested, but neither the great mass of bondholders nor the local communities are in a position to exercise discretion in an emergency, and the public officers who hold the funds are limited in their discretionary powers by the statutes. The legislature, representing the sovereign people, has seen fit to intervene and exercise its discretion in the management of the funds in the interest of the public and the great number of individuals whose interests are involved. We must assume that the legislature believed the public welfare required the measure under consideration, and we cannot say that the means adopted for the protection of the funds have no reasonable relation to that end.

The police pension fund and the firemen pension fund are trust funds created by statute, administered by a statutory board of trustees, of which the city treasurer is treasurer. The funds are raised partly by taxation, partly by the diversion of other public monies, and partly by assessment upon the salary of members of the police and fire forces. The trusts are created and controlled by statutory provision.

The statute provides for the investment of the funds belonging to the trusts, except such as are needed for current expenditures, in interest-bearing government or municipal securities. Nothing is said in the statutes concerning the deposit or safekeeping of current funds which are not to be invested, except that the treasurer of the city shall be responsible for them. The trusts are public trusts, otherwise the levy of a tax for their support would not be justified. The public has an interest in their administration. The public treasurer of the city has custody of the funds, and no reason is seen why the treasurer should not be permitted and required to deposit current balances in public depositories chosen in the statutory manner. If they are public funds which are required to be deposited by a public officer, as other public funds are deposited, they come within the purview of the act under consideration. Even though the members of the police and fire forces have some interest in the funds, since they contribute part of their salaries thereto, no reason is seen why the legislature may not change and modify the statutes regarding the operation of the trusts by changing the character of securities in which they are to be invested, and by requiring that current funds in the hands of the treasurer shall be secured against loss, either by the public sinking fund or by insuring with private insurance companies at the expense of the fund.

The trustees of Purdue University and Indiana University hold certain donations, bequests, and devises in trust for the benefit of education in connection with the universities, the particular purposes for which the income on the trust property is to be used having been expressly provided in the trust instruments. Some of these funds are invested in real estate, and some in securities of various sorts. Cash working balances and funds collected from or awaiting invest-

ment are deposited under the Public Depository Act of 1907 and its amendments. The trustees concede that such current funds are properly so deposited, and intimate that they are entitled to the protection of the insurance furnished by the sinking fund; but contend that to divert any of the interest thus earned would impair contractual obligations and encroach upon vested rights, since it would be a diversion of part of the income on the trust to purposes other than those provided for by the donors. What has been said above largely answers the contention. Private trustees would be expected to exercise a sound discretion in depositing the current funds of the trust; at least in the absence of an express provision in the trust instrument as to their investment. When the trustors created the trusts and placed them in the hands of public officers they must be deemed to have understood that the discretion of those officers concerning the details of safeguarding and preserving the corpus of the trust, and insuring the safety and availability of current funds, could be and might be controlled by the legislature.

In the case of *Boyd et al.* v. *Johnson, State Treasurer et al.* (1931), 212 Iowa 1201, 238 N. W. 61, the Supreme Court of Iowa held that a sinking fund statute, similar to the one here under consideration, was not intended by the Iowa legislature to apply to a trust fund which had been devised and bequeathed to the board of directors of a school district. What considerations led the court to this conclusion do not appear upon the face of the opinion. Our statute, by its terms, is made to apply to all public funds which are required to be deposited in public depositories. In the absence of an express exception, we can find no basis for concluding that the legislature intended to exempt any such funds.

If funds are left in the hands of a private trustee,

with power to invest in mortgages upon real estate, and with specific directions that the income from the ██ ██ trust is to be used for a specific purpose, and a mortgage upon real estate, upon which are valuable buildings subject to fire hazard, is in default, and the insurance lapses upon the buildings, it cannot be questioned that the trustees have discretionary powers to expend some of the income of the trust for fire insurance in order to protect the investment from irretrievable loss, and that a court of equity would sustain the trustees so long as the discretion exercised can be said to be dictated by reasonable prudence. No reason is seen why the legislature may not, as a matter of public policy, require trustees, public or private, to take such steps for the preservation of trusts as reasonable prudence may require; and, in the absence of a showing of facts which would justify a court of equity in holding that a private trustee had abused his discretion under the same circumstances, it cannot be said that the legislature has exceeded its power.

When this statute was enacted the safety of deposits in banks was questionable, and no man could say from day to day what bank was secure. When such a situation will arise again, no one knows. If, under such circumstances, a private trustee took advantage of an available opportunity to insure current trust funds in his hands against loss, at an expense of a fraction of the interest earned on the deposit, as an alternative to withdrawing the deposits and depositing them in a safety-deposit box, thus foregoing any interest, or if he had adopted the latter course, a court of equity would hardly say that he had abused his discretion. The problem of procuring a high interest return upon capital always involves the problem of safeguarding principal. Otherwise capital would always be invested so as to yield the highest available interest rates. The discretion exercised

by trustees in accepting lower interest rates in order to procure greater safety for principal, can hardly be criticized as unsound. That is, in effect, what is accomplished by the present statute. The principal of the funds involved is secured at the expense of a lower ultimate net interest return. That such was the legislative purpose is quite evident.

It is not the purpose of the law to impair the obligations of contracts, to divert funds to other than their statutory purposes, nor to cast any additional burdens upon anyone. It is designed to safeguard and protect every interest that is here complaining. There has been no effort to show that it will not accomplish the purposes for which it was intended. Its enactment was fully within the legislative power. By its terms all public funds subject to deposit in public depositories were intended to come within its terms, and therefore public officers are required to divert interest on all such public deposits according to the terms of the act.

Judgment reversed, with instructions to the trial court to restate its second conclusion of law, and render judgment not inconsistent with this opinion.