BUDNIK ET AL. *v.* CITIZENS TRUST & SAVINGS BANK OF SOUTH BEND ET AL.

[No. 27,689.  Filed October 27, 1942.]

*Arnold, Degnan, Dohnalek & Goheen,* of South Bend, for appellants.

*Vitus G. Jones, Roland Obenchain, Paul M. Butler,* and *Francis Jones,* all of South Bend, for appellees.

*George N. Beamer,* Attorney General, *James K. Northam,* First Assistant Attorney General, and *Joseph W. Hutchinson,* Deputy Attorney General, *amici curiae.*

FANSLER, J.—This action was begun by Andrew Woodka, seeking a judgment upon a bank deposit account. His executors and trustees were substituted as parties plaintiff at his death. There was judgment for the defendants.

The only error assigned questions the correctness of the decision upon the facts.

There is no conflict in the evidence. The defendant trust company was organized under the laws of this State in 1900, and at the time of the transactions here involved had banking powers. On January 1, 1933, the plaintiff had on deposit in a savings account with the trust company the sum of $17,559.07. On February 23, 1933, it was unable to pay its deposits and suspended banking operations. It is alleged by answer, and admitted, that during the years 1931 to 1935, inclusive, a financial and economic depression existed throughout the country; that its initial effect was a serious reduction in the market value of securities, which was followed by unemployment and a lack of credit for farmers, business men, and property owners, and the lowering of prices of products of farms and factories, and a general stagnation of business and industry; that there was a shrinkage of values and income from lands and improvements, and that the market for the sale of real estate was destroyed; that in the City of South Bend, where the trust company was operating, the number of banking institutions was reduced from a maximum of eighteen to three operating on January 1, 1934; that the amount of free deposits and unrestricted shares in building and loan associations was reduced from approximately $55,000,000 to not to exceed $4,000,000; that the value of the real and personal property held by the trust company, and the ability of its debtors to pay, greatly decreased, and the value of its

assets fell beneath its liabilities; that it suffered large withdrawals and was unable to meet its obligations; that on the date of its suspension, the Banking Commissioner of the State of Indiana promulgated a resolution restricting the payment of savings deposits and certificates of deposit by said trust company for ninety days, and restricted payments on checking and demand deposits to an amount not exceeding five per cent. in any calendar month; that the regulation provided that deposits received after February 27, 1933, should be held in cash or cash items and should hold priorities in payment over previous deposits. The trust company was closed to depositors from February 23rd to February 27th. In March, the President of the United States issued a proclamation closing all banks, and on March 11th the Banking Commissioner of Indiana promulgated a regulation conforming to and supplementing the presidential order. Thereafter, and pursuant to the authority granted by the presidential order, the Banking Commissioner of Indiana promulgated a rule permitting the opening of certain banks under certain restrictions. These banks were known as "B" banks. Withdrawals on savings deposits and certificates of deposit were prohibited for ninety days, withdrawals on checking or demand deposits were limited to 5 per cent. until the modification of the order, and deposits thereafter made were to be held in cash or other liquid items, subject to withdrawal in full. The trust company was reopened as a "B" bank, and operated as such until April 1, 1935.

In 1934 the Department of Financial Institutions prescribed a plan for the rehabilitation and reorganization of the trust company. Notice of the plan was given to all depositors, creditors, and stockholders. On May 29, 1934, more than 90 per cent. of the stock-

holders consented to the plan, and originally 86½ per cent. of the creditors consented, and 99 per cent. in number of the deposit creditors consented prior to April 1, 1935. The plan was adopted, and as a part thereof the trust company adopted articles of reorganization approved by the Department of Financial Institutions on May 4, 1934, and by the Secretary of State on June 1, 1934, and by the Federal Deposit Insurance Corporation on March 21, 1935. The plan and reorganization went into effect on April 1, 1935. By the reorganization agreement, the trust company accepted the terms of the Financial Institutions Act (Acts 1933, ch. 40, p. 176), approved February 24, 1933. Its capital stock was reduced from $500,000 to $250,000, and $250,000 of new capital was subscribed and paid in by the stockholders. This procedure had the effect of wiping out the equity of the stockholders in the assets of the trust company as it existed before its rehabilitation by reorganization. The reorganization and rehabilitation plan does not appear in the record, but it is made to appear that, as a part of the plan, the assets of the company that the department deemed acceptable for the conduct of sound banking operations were, as of April 1, 1935, turned over to the reorganized company as assets of the company. The remaining assets were placed in trust for the benefit of the creditors of the company as they existed before that date. The reorganized company became liable to pay in full the deposits made by school children through the schools of the city, known as "School Thrift Deposits," and to pay in full all deposits of $25 or less, and to pay 50 per cent. of the remaining deposit liabilities of the trust company as they existed before reorganization, all of which became immediately payable on demand, and the reorganized company was dis-

charged of liability for the remaining 50 per cent. of deposit liability. The assets which were placed in trust were to be liquidated and paid *pro rata* to the creditors. The amount of liabilities of the trust company prior to the effective date of the reorganization is not disclosed by the record, nor is the cash value of the assets turned over to the reorganized company. It must be assumed, however, that the Department of Financial Institutions, established for the protection of depositors and creditors and the public, was "satisfied that the plan of reorganization is fair and equitable as to all depositors, other creditors and shareholders and is in the public interest." On July 30, 1938, the reorganized trust company was consolidated with the City National Bank of South Bend, under the national banking laws. By the consolidation agreement, the stockholders in both institutions surrendered their capital stock and in lieu thereof accepted an equal number of shares of stock of the consolidated bank. The consolidated bank took over the assets of the trust company and assumed its liabilities as of the date of consolidation. The consolidation was approved by the Comptroller of the Currency.

There is no contention that the assets turned over to and retained by the reorganized trust company were of a value in excess of the liabilities assumed. The appellants rely upon the contention that the plan was proposed and consented to, and the reorganization steps taken, prior to January 28, 1935, the date upon which section 9 of chapter 5 of the Acts of 1935 was approved and became effective, and that prior to that date there was no power or authority vested in the Department of Financial Institutions to work out such a plan and carry it into effect, but that, assuming that the action of the department was within its authority and in conformance to the requirements of section 9, the section is uncon-

stitutional under Section 10 of Article 1 of the Constitution of the United States, which forbids the enactment of a law impairing the obligation of contracts.

The pertinent portion of the statute in question is as follows:

"That section 47 of the above entitled act be amended to read as follows: Sec. 47. Any financial institution which shall have been closed, for any reason, or placed on a restricted license, is hereby authorized to resume business either in the manner and subject to the conditions prescribed in subsection (a) of this section, or, in the manner and subject to the conditions prescribed in subsection (b) of this section:

"(a) The department may at any time after taking possession of the business and property of any financial institution upon such conditions as may be approved by the department, surrender such possession to such financial institution for the purpose of permitting it to resume business.

"(b) In any reorganization of any financial institution under a plan prescribed by the department which requires the consent, as the case may be, (a) of depositors and other creditors or (b) of shareholders or (c) of depositors, other creditors and shareholders, such reorganization shall become effective only (1) when the department shall be satisfied that the plan of reorganization is fair and equitable as to all depositors, other creditors and shareholders and is in the public interest and shall have approved the plan subject to such conditions, restrictions and limitations as it may prescribe and (2) when, after reasonable notice of such reorganization as the case may require, (A) depositors and other creditors of such financial institution representing at least seventy-five per cent in amount of its total deposits

and other liabilities to creditors as shown by the books of the financial institution or (B) shareholders owning at least two-thirds of its outstanding capital stock as shown by the books of the financial institution or. (C) both depositors and other creditors representing at least seventy-five per cent in amount of the total deposits and other liabilities to creditors and shareholders owning at least two-thirds of its outstanding capital stock as shown by the books of the financial institution, shall have consented in writing to the plan of reorganization: *Provided, however,* That claims of depositors or other creditors which will be satisfied in full under the provisions of the plan of reorganization shall not be included among the total deposits and other liabilities to creditors of the financial institution in determining the seventy-five per cent thereof as above provided. When such reorganization becomes effective, all books, records, and assets of the financial institution shall be disposed of in accordance with the provisions of the plan and the affairs of the financial institution shall be conducted by its board of directors in the manner provided by the plan and under the conditions, restrictions and limitations which may have been prescribed by the department. In any reorganization which shall have been approved and shall have become effective as provided herein, all depositors and other creditors and shareholders of such financial institution, whether or not they shall have consented to such plan of reorganization, shall be fully and in all respects subject to and bound by its provisions, and claims of all depositors and other creditors and shareholders shall be treated as if they had consented to such plan of reorganization."

This act became effective on January 28, 1935. The opening language of clause (b) is significant: "In any reorganization of any financial institution under

a plan prescribed by the department which requires the consent . . . of depositors," etc. The statute does not make consent of the stockholders necessary. It merely provides that if the plan prescribed by the department requires consent, it shall be necessary to procure the consent of a certain percentage. This section of the statute makes no provision for notice. It says: ". . . after reasonable notice . . . as the case may require." Section 164 of the act of 1933 (Acts 1933, chapter 40, page 176, § 18-1003, Burns' 1933, § 7886, Baldwin's 1934) provides for notice to stockholders before a reorganization can be accomplished, and it may be concluded that this is the notice referred to by the language last quoted. But if the act be construed to require notice and consent, its terms were complied with. Notice was given, and the reorganization did not become effective until after the requisite number of creditors and shareholders had consented in writing. The language of the statute is: ". . . such reorganization shall become effective only . . . when . . ." the prescribed number of stockholders and creditors "shall have consented in writing to the plan of reorganization . . . ."

The appellants assert that unless the plaintiff became a contracting party to the rehabilitation and reorganization agreement, he is not bound thereby; that the other creditors cannot bind him by their agreement. But the rehabilitation and reorganization was not accomplished by contract with the creditors. It was accomplished by the order and approval of the banking department. The consent of the creditors and shareholders is merely a prerequisite to action by the department. The department is an agency of the State, vested with power to act for the protection of the interests of all parties, including the

public. See *Doty et al.* v. *Love, Supt. of Banks* (1935), 295 U. S. 64, 55 S. Ct. 558, 79 L. Ed. 1303, 96 A. L. R. 1438.

The business of banking is affected with a public interest. The safety of banking institutions, and in case of insolvency their liquidation, affects the ▮▮▮ interest of the public. It is the universal practice to regulate the banking business and to provide special agencies and methods of liquidation thought to best serve the interests of creditors and stockholders and the community involved. *State* v. *Richcreek* (1906), 167 Ind. 217, 77 N. E. 1085; *Storen, State Treas.* v. *Sexton, Marion County Treasurer, et al.* (1936), 209 Ind. 589, 200 N. E. 251; *Priest* v. *Whitney Loan & Trust Co.* (1935), 219 Iowa, 1281, 261 N. W. 374; *Veix* v. *Sixth Ward Building & Loan Ass'n* (1940), 310 U. S. 32, 60 S. Ct. 792, 84 L. Ed. 1061. At the time the deposit in question was made, the banking department had full supervision over banks, with power to suspend their banking operations and enforce their involuntary dissolution whenever, in the judgment of the department, they are found to be insolvent or in an unsafe condition. The plaintiff's deposit agreement was subject to all laws in existence at the time it was made, and, as was said by the Supreme Court of Iowa, in *Priest* v. *Whitney Loan & Trust Co., supra* (page 1287, 219 Iowa, page 378 of 261 N. W.) : "Not only this, but it has been universally held by courts of last resort everywhere that contracts made with institutions such as banks affected with a public interest are likewise inherently subject to the paramount power of the sovereign state, the people—the reserve power, sometimes called the police power—to enact, through the legislature, additional remedial legislation in the public interest, affecting the supervision, regulation, control,

or liquidation of banking corporations." The case quoted from is in many respects similar to the case at bar. It was followed in *Timmons et al.* v. *Security Savings Bank of Marshalltown* (1936), 221 Iowa, 102, 264 N. W. 708, and in the latter case an appeal to the United States Supreme Court was dismissed for want of a substantial federal question. See 299 U. S. 503, 57 S. Ct. 15, 81 L. Ed. 373. Under the law, as it was at the time the deposit contract was made, the plaintiff's right to collect his deposit by action against the banking corporation ceased to exist when the bank was closed by the banking department. His remedy then consisted of the right to participate ratably in the proceeds of the liquidation of the bank's assets, together with a right of action against the stockholders under their constitutional liability. He had no vested right to have the liquidation carried forward in any particular manner. The right to provide and to change methods of liquidation was in the Legislature. It was held in *Gibbes* v. *Zimmerman et al.* (1933), 290 U. S. 326, 54 S. Ct. 140, 78 L. Ed. 342, that a bank depositor had no vested right to have liquidation by a court-appointed receiver for an insolvent bank; that a statutory provision for liquidation by a conservator, under direction of the Governor, did not invade the depositor's substantive rights, and, upon authority of this case, it was said in *Doty et al.* v. *Love, Supt. of Banks, supra* (page 70 of 295 U. S., page 561 of 55 S. Ct., page 1308 of 79 L. Ed., page 1442 of 96 A. L. R.) : "The Constitution of the United States does not confer upon the depositors a vested right to liquidation at the hands of a state official."

The statute merely authorizes a plan of reorganization which "is fair and equitable as to all depositors,

other creditors and shareholders and is in the public interest . . . ." The statute is not unconstitutional on its face. A plan of reorganization or liquidation which would strike down substantial constitutional rights could not be described as fair and equitable, and the statute must be construed as vesting the department with authority to prescribe only a fair, equitable, legal, and constitutional liquidation and reorganization. It was said in *Priest* v. *Whitney Loan & Trust Co., supra* (pages 1304, 1305 of 219 Iowa, pages 386, 387 of 261 N. W.) :

"Until some showing is made to the contrary, the actions of the superintendent of banking and other public officials in connection with the reorganization of said bank are presumed to be regular, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131, at page 142. Under this presumption, it will be taken that the superintendent acted upon knowledge of all the material facts. Likewise, it will be presumed that the superintendent of banking had knowledge of the material facts, and that he acted in the light of such facts. He represented the bank, the stockholders, and creditors, and is presumed to have acted impartially until it is shown to the contrary. There is no claim by the plaintiff that she was not fully apprised of the proposed and final reorganization of the bank. She was solicited to join with the other depositors. Under such circumstances, unless the rules and regulations and plans promulgated by this statute are so clearly unreasonable and without substantial relation to the public interest, and constitute a clear and unmistakable infringement of some constitutional guaranty, the law must be upheld. . . .

"The action of the superintendent of banking, of course, is not a finality. He is an administrative officer. The court of chancery is at all times open to any interested party to test the legality of his acts, to inquire into the fairness and regularity thereof, and to prevent unreasonable and arbitrary action on his part, and the court will inquire into all such matters in a proper case by an interested party whose rights have been unduly interfered with to his injury. That a court of equity would interfere by injunctive process to prevent arbitrary action of an administrative officer in the discharge of his duties is elementary. See *Commonwealth* v. *Hargis Bank & Trust Co., supra;. Doty* v. *Love, supra,* wherein Justice Cardozo said:

" 'The jurisdiction of the court of chancery to give approval to a settlement by a receiver or other officer did not have its genesis in the act of 1932 or in the procedure there prescribed. It existed in like measure when the liquidation of this bank was begun in 1930 and for many years before. Depositors were chargeable with notice of that power and became subject to its exercise in making their deposits.' "

The complaint is primarily an action against the reorganized trust company, and it declares upon the original deposit agreement. The answer sets up all of the facts above recited concerning the reorganization. The terms of the rehabilitation and reorganization agreement are not disclosed by the record, except as indicated in the facts above recited. The plaintiff contends that the bank with which he made the deposit contract is the same bank against which he is now seeking judgment, and that it is now a going concern, and that there is no bar to his maintaining the action. But if the substance is looked to rather than the form, the realities rather than the technical

structure, the plaintiff's contention is not supported. The reorganization required the approval of the Secretary of State, the public officer whose approval was required for an original incorporation. The reorganized bank submitted itself to the terms of a banking law which was new and different from that under which it was incorporated. By the reorganization plan, the old capital stock and the equity of the old stockholders in the assets of the old bank were wiped out. The reorganized bank started with new capital and with assets which it acquired by reason of an agreement with the banking department that it would become liable for all of the deposits held in trust by the original organization under its limited operation and for certain specific obligations of the old institution. The stockholders of the reorganized institution contributed $250,000 of new money, which became liable for the obligations which it assumed, and this new capital added assurance that the obligations assumed would be paid. It is true that the contributors of the new capital seem to have been the old stockholders, but it cannot be seen that this alters the status of the reorganized company. They might have been strangers. The public had an interest in maintaining banking facilities in the community. It cannot be doubted that an entirely new bank with new capital might have been organized by the stockholders of the old bank and the liquid assets of the trust company might have been transferred to the new bank by the Department of Financial Institutions in consideration of the assumption of liabilities of the old bank to the extent of the value of the assets turned over. But the interest of the community might have been better served by the continuance of the old bank on a rehabilitated and solvent basis. No sound reason can be seen for denying the public the benefit of a continuance of the

old bank. The effect upon the rights of the creditors of the old bank are the same. In determining whether rights protected by constitutional guaranties have been invaded, courts look to the substance and not the form. *Priest* v. *Whitney Loan & Trust Co., supra,* and cases cited. It is not the theory of the plaintiff's case that, in the liquidation of the assets of the original institution, there was discrimination against him or that any part of the assets were diverted. The reorganization and rehabilitation plan, approved by the banking department, must be looked upon as a lawful plan, designed to properly, fairly, and equitably liquidate and apply the assets of the trust company. That it accomplished, and is accomplishing, this purpose is not questioned by the complaint. Whether the plan contemplated the release of the stockholders' constitutional liability is not disclosed, nor are we concerned with that question now, since this action is against the bank which was never liable for the stockholders' constitutional liability. So far as this record discloses, the stockholders' liability may have been paid, or there may now be suits pending to enforce that liability. It is clear that it was not contemplated by the plan that the reorganized bank should be liable for all of the obligations incurred before reorganization. If such liability was contemplated, the reorganized bank would have been insolvent immediately, and it would have been the duty of the banking department to close and liquidate it immediately.

As pointed out in a number of the cases cited, the contribution of new capital and rehabilitation and reorganization of the bank tended to expedite the liquidation of small claims and of the better assets of the old institution. Fifty per cent. of the claims of depositors became immediately available. This was

a benefit to the depositors, and the fact that the plaintiff did not collect this portion of his money after he was assured that he could get it does not alter the fact.

While no complaint has been made of the equity of the plan by which liquidation of the assets of the original institution was accomplished, it may be said in passing that the fact that small claims were paid in full is not an indication of inequity. It has been pointed out in *Doty et al.* v. *Love, Supt. of Banks, supra,* and *Priest* v. *Whitney Loan & Trust Co., supra,* that it may be more economical to pay such claims in full than to incur the accounting expense incident to their ratable payment out of liquidating dividends.

The short answer to the plaintiff's complaint, that his constitutional rights have been impaired and invaded, is that he has shown no impairment or invasion. The constitutional question arises not upon the facts shown by the complaint, but upon the facts shown by the answer. It having been admitted that the banking department, an instrumentality of government and invested with power so to do, had conceived a plan of liquidation and caused it to be carried forward, the presumption is that that ministerial body acted lawfully, fairly, and constitutionally until the contrary is made to appear. There is no showing, or attempt to show, that the rehabilitation plan in any way impaired or abridged the plaintiff's rights under his deposit agreement with the old trust company, or that he was deprived in any degree of his right to fully participate in the distribution of the proceeds of the assets of that company which were liable for the payment of his claim.

Judgment affirmed.

NOTE.—Reported in 44 N. E. (2d) 298.