John M. Dowe, Comptroller [Raymond S. Thatcher, Comptroller, Substituted Plaintiff] et al. v. John J. Egan, Commissioner of Labor and Factory Inspection

Maltbie, C. J., Brown, Jennings, Ells and Dickenson, Js.

Argued May 15—decided July 16, 1946

*Arthur F. Brown,* assistant attorney general, with whom, on the brief, was *William L. Hadden,* attorney general, for the plaintiff.

*Harry Silverstone,* assistant attorney general, for the defendant.

MALTBIE, C. J.  The General Assembly at its 1945 session amended the Unemployment Compensation Law to provide that when the treasurer of the state, as treasurer of the unemployment compensation fund, has, at the direction of the administrator, requisitioned from the unemployment trust fund held by the treasurer of the United States such amount as the administrator deems necessary the treasurer "shall deposit such moneys in the benefit account of the unemployment compensation fund," and that the benefits provided under the act should be paid "from the benefit account by the administrator, who alone shall make withdrawals from such account and who shall make such withdrawals only for the purpose of paying such benefits," with a further provision that the administrator should give a bond for the faithful performance of his duties in connection with the benefit account. General Statutes, Sup. 1945, § 969h. The question presented

upon this reservation is whether this method of dispensing benefits from the fund is constitutional. Section 17 of article fourth of the constitution of Connecticut establishes the office of state treasurer and among other things provides: "He shall pay no warrant, or order for the disbursement of public money, until the same has been registered in the office of the Controller." Section 19 of that article, which establishes the office of "Controller of the public accounts," provides: "He shall adjust and settle all public accounts and demands, except grants and orders of the General Assembly." The plaintiffs' claim is that § 969h contravenes these provisions.

The Unemployment Compensation Act provides: "There is created in the state treasury a special segregated fund to be known as the employment security administration fund"; it consists of all moneys appropriated by this state or received from the federal government or any of its agencies or from any other source for the purpose of defraying the cost of administering the act; the treasurer is liable "on his official bond" for the faithful performance of his duties with respect to the fund; and expenditures from it are to be made "on warrants drawn by the comptroller at the direction of the administrator." General Statutes, Sup. 1941, § 723f (a), (c). The act also provides: "There is created in the state treasury a special segregated fund to be known as the unemployment compensation fund, in which there shall be two accounts, namely, the contribution account and the benefit account"; the fund consists of all contributions and moneys or property received for the payment of unemployment compen-

sation benefits; the expenditures from it can be made only for the purpose of paying benefits and certain refunds to contributors provided for in the act; and the state treasurer is "liable on his official bond" for the faithful performance of his duties in connection with this fund. General Statutes, Sup. 1941, § 724f. Receipts of contributions and other moneys for the fund are to be paid to the treasurer, who is to deposit them in the contribution account; after deducting any money necessary for refunds, the balance is to be paid, on warrants drawn by the comptroller at the direction of the administrator, to the secretary of the treasury of the United States. General Statutes, Cum. Sup. 1939, § 1344e (b). Then follows the section of the act directly involved in this controversy and from which we have quoted at the beginning of this opinion; we note, however, that, as it originally appeared in the act, this section provided that payments of benefits were to be made "on warrants drawn by the comptroller at the direction of the administrator." General Statutes, Cum. Sup. 1939, § 1344e (c). If the federal act upon which our law is founded becomes ineffective, the provisions of our law requiring contributions and providing for the payment of benefits are no longer to be operative, and, unless the General Assembly prior to the adjournment of its next regular session shall legislate to the contrary, moneys in the unemployment compensation fund, less expenses of administration, are to be refunded to contributors under regulations adopted by the administrator. General Statutes, Cum. Sup. 1939, § 1349e (b).

The defendant administrator contends that the

unemployment compensation fund is a trust fund, with the implied conclusion that its administration does not fall within the constitutional provisions we have quoted. That it constitutes a trust in the technical meaning of the word would be difficult to maintain; see *Winchester* v. *Cox,* 129 Conn. 106, 112, 26 A.2d 592; but that is not the controlling question. It is rather: Did the fund consist of "public money," and were the demands upon it by beneficiaries "public accounts" within the meaning of the constitutional provisions we have quoted?

In *Waterbury Savings Bank* v. *Danaher,* 128 Conn. 78, 86, 20 A.2d 455, we said of the Unemployment Compensation Act: "In view of the extent of the unemployment problem and the purpose and method of the act to meet it, the enactment is one clearly within the state's police power exercised in pursuance of 'public . . . governmental purposes.' . . . Neither the fact that the payments required of employers under it are termed 'contributions' nor that these payments when received are segregated in a separate fund to be applied to the purposes of the act renders them any the less taxes. That the legislature regarded them as such is indicated by its action in expressly conferring upon the administrator all of the powers of a tax collector to insure their collection (§ 1345e), and, as was said by the court of the Arkansas act, 'that the required payment is referred to in our Act 155 as a "contribution" is of no significance. It is compulsory contribution, and therefore a tax.' *Buckstaff Bath House Co.* v. *McKinley,* 198 Ark. 91, 99, 127 S. W. 2d 802." Under the act funds for administering it and contributions are to be paid into the state treasury; legal title to

the money so collected undoubtedly vests in the state; the faithful performance of the duties of the treasurer with respect to the fund is covered by his "official bond," that is, the bond "conditioned for the faithful performance of his duties" as treasurer "other than in connection with the school fund." General Statutes, § 75. As the act was originally enacted, money could be withdrawn from either of the special funds created by it only on warrant of the comptroller, and that is still true of money in the administration fund. Money in the treasury of the state may be none the less "public money" because it consists of a special fund which can be used only for a particular purpose, as, e.g., the school fund, perpetually dedicated by the constitution to the support and encouragement of the public schools of the state. Const. Conn. Art. VIII, § 2. Without attempting an all-inclusive definition of the words "public money" as used in our constitution, they certainly include money raised by the state by compulsory process in order to carry out one of its governmental purposes and deposited in the state treasury until properly disbursed; *State* v. *Robinson,* 59 Idaho 485, 495, 83 P.2d 983; *Tesch* v. *Board of Deposits,* 237 Wis. 527, 531, 297 N. W. 379; *Branch* v. *United States,* 12 Ct. Cl. 281, 289; *Storen* v. *Sexton,* 209 Ind. 589, 597, 200 N. E. 251; *State ex rel. St. Louis Police Relief Assn.* v. *Igoe,* 340 Mo. 1166, 1174, 107 S. W. 2d 929; and any claim for payment from the fund is a "public . . . demand." If, indeed, the General Assembly can create a fund so collected, held and disbursed that it would not fall within the words "public money" as used in the constitution, the act before us gives no

indication of an intent to do so. The unemployment compensation benefit fund constitutes "public money" as those words are used in the constitution.

After the independence of this country became established, the government of this state was carried on, as it had been before, under the charter of King Charles II granted in 1662. The broad powers given the General Assembly in that charter enabled it largely to shape by statute our form of government. The constitution adopted in 1818 did not create a government but gave to that which had already been established the sanction of the people and, in very general language, formulated its framework. To understand the intent of the instrument it is often necessary to have recourse to the form of government as it had existed before, and did exist at the time of, the adoption of the constitution. See *Walkinshaw* v. *O'Brien*, 130 Conn. 122, 127, 32 A.2d 547.

In considering the constitutional provisions we have quoted, our inquiry necessarily starts with the powers and functions of the committee of the pay-table.. That committee was established at the April session of the General Assembly in 1775, and its principal function was stated to be "to examine, liquidate, adjust, settle and give needful orders for the payment of the several accounts of the expences that have or may be incurr'd relative to assembling, equipping, supporting, encouraging or paying wages to such of the inhabitants of this Colony that have or may assemble or inlist for the defense of this Colony for the current year; said committee to proceed therein according to such orders, rules

and directions, as shall from time to time be given by this Assembly for that purpose." 14 Col. Rec. 431. At the next session of the Assembly in May, 1775, a resolution was passed that "all accounts of disbursements made by order or direction of this Assembly relative to the present extraordinary emergencies of government be laid before the Pay-Table Committee already appointed, to be by them examined, settled and adjusted"; and the committee "are hereby directed to draw all needful orders on the Treasurer for the payment thereof." 15 Col. Rec. 36. At the session of the Assembly held in October of that year, the committee was directed "to prepare and state" an account of all the expenses of the colony in raising and equipping troops for the defense of the common cause of America, to be transmitted by the governor to the Continental Congress. 15 Col. Rec. 143. Thereafter the committee was very largely concerned with the expenses incurred by the state in conducting the War of the Revolution, although as time went on much broader functions were given to it, and there are indications that it was increasingly regarded as one of the principal sources of information as to the financial affairs of the state. See 3 State Rec., pp. 184, 238, 248, 468.

Throughout the period of the existence of the committee, provision was generally made for payment of the expenses of the state in one of four ways which may be classified as follows:[1]  First,

[1] The statements hereafter made are based upon a page-by-page examination of the Colonial and State Records, both printed and unprinted, from April, 1775, to the adoption of the constitution in 1818. To make reference to all the particular acts and resolutions studied would greatly cumber the opinion and they have been for the most part omitted.

the General Assembly made grants of specific sums, usually for the payment of salaries of state officials but sometimes to others; in a few instances an order on the treasurer to make the payment was added; and on two or three occasions, instead of a grant, an allowance was made, to be paid out of the public treasury. Secondly, in numerous instances the General Assembly or the council of safety, which very largely directed the participation of this commonwealth in the War of the Revolution, passed resolutions directing the treasurer to make payments to a certain individual or individuals of sums stated either in the "memorial" in response to which the resolution was passed or in the resolution itself. Thirdly, more often, the Assembly or the council passed resolutions directing the committee to draw orders on the treasurer for specific sums which were stated in the memorials or the resolutions or, in a few instances, were to be determined by a special committee or other officials. Fourthly, and most frequently, one body or the other passed resolutions, usually in response to memorials addressed to it, in which the pay-table committee was directed to determine the amount due to the particular claimant or claimants and to draw an order on the treasurer for payment; in these resolutions the claim was usually referred to as an "account"; and, while in some instances the determination of the amount required consideration of countercharges, usually the duty of the committee was to fix the sum due to an individual or individuals, as for goods or services rendered, or to each of a group or class, as in making up payrolls for the troops or amounts due several towns for articles furnished. In resolutions falling within the fourth class, the direction to the committee to as-

certain the amount due was variously expressed: adjust; settle; liquidate; settle and adjust or adjust and settle; receive and adjust; receive, examine and settle; liquidate and settle; liquidate and adjust; liquidate, adjust and settle; adjust and allow; adjust and liquidate; settle and allow; and settle and liquidate. It should be noted that the provision for payment, except in the first class, invariably took the form of a resolution as distinguished from public acts, which were passed at every session of the Assembly throughout this period.

At the October session of the General Assembly in 1780, in a resolution broadening the functions of the committee it was authorized "to settle and adjust" any depreciation either in favor of or against the state; it was to call upon King's attorneys of the various counties while the government was a colony and upon state's attorneys after independence for accounts of rents for estates committed to their care and to "get them justly and fully settled and adjusted"; it was to call on officers and others for their accounts and "settle" them; it was to "settle and liquidate" the accounts of the state's representatives in Congress; and it was to "state and keep account for expresses and other such like service" ordered by the Assembly, or the governor and council of safety, and to "settle, adjust and order payment by one general rule." 3 State Rec. 185, 186. During this period the Assembly at times authorized the payment of money to be made by the treasurer upon the order of others. Thus at the session of the Assembly held in January, 1782, the Supreme Court was authorized to draw on the treasury "for their Wages," and the secretary of the state and the treasurer were empowered to draw orders for the ex-

penses of their offices; 4 State Rec. 24; and from certain entries in the records of the council of safety for 1785 it appears that its clerk was authorized to draw orders on the treasurer for the support of the state poor and other expenses. 6 State Rec. 534 et seq.

At the session of the Assembly held in May, 1786, it was provided that there should be "a Comptroller of all Public Accounts of this State." 6 State Rec. 152. He was given access to the offices of the treasurer, the secretary and the committee of the pay-table; he was from time to time to report all debts and credits of the state; he was authorized to present and prosecute actions at law in its behalf; a copy of all receipts for money paid into the treasury was to be filed with him; he was to report to the Assembly all moneys received into the treasury from taxes and all appropriations; he was to have general superintendence of all matters that concerned the subject of state finance; under the control of the Assembly he was to advise as to the mode of "keeping Stating adjusting and Liquidating" the public accounts of the state, and to take care that the legal and necessary checks in keeping accounts be instituted; he was to report to the Assembly such measures as he deemed necessary for the economical administration of the state finances; and the act went on to provide that no orders upon the treasurer should thereafter be paid until they were "entered on the Books of the Pay Table Office," and a certificate of that entry indorsed on them. This act was apparently somewhat experimental because it was to continue in force only for two years from the rising of the Assembly.

At the session of the Assembly held in May, 1788,

the office of "Comptroller" was continued by another act which defined his functions. 6 State Rec. 404. This act, though differently phrased, gave to him much the same powers as were stated in the law of 1786. It specifically authorized him "to Liquidate all Accounts due from this State to any Person or Persons, pursuant to such Orders, as have been Given to the Pay Table Committee, or which may be given to him by the General Assembly, to keep the Proper Accounts, and to draw orders on the Treasury for Payment"; and the act also provided that no orders thereafter drawn on the treasurer should be paid until they were entered on the comptroller's book and a certificate of the entry indorsed upon the order. This act also was to continue in force only for two years after the rising of the Assembly. At the same session the comptroller was vested with all the powers and authority before exercised by the committee of the pay-table and that committee was abolished; 6 State Rec. 412; but at that session a few claims were still referred to it for settlement, and a claim was referred to the committee or the comptroller "to adjust and settle the Account" and draw an order on the treasurer for the payment of the amount due; 6 State Rec. 432; and another claim was referred to the comptroller with a direction to "Liquidate Adjust and Settle the Accounts" and to draw on the treasurer for payment. 6 State Rec. 433. At the session of the Assembly held in October, 1788, a claim was referred to the comptroller with direction "to settle said Account" and to give an order on the treasurer for the amount found due; 6 State Rec. 486. At the session of the General Assembly held in January, 1789, an act was passed amending the act regulating the treasury

which provided that after the first day of March following "all demands against this State not first Liquidated and allowed by the General Assembly or by the Governor and Council or House of Representatives or Supreme Court of Errors, or by the Superior Court, or by a Court of Common Pleas, by virtue of some express Law, shall be Liquidated and settled by the Comptroller; who shall give Orders on the Treasurer for the Ballances by him found, and allowed before the Treasurer shall pay the same, any Thing in said Act notwithstanding." 6 State Rec. 502.

Until the adoption of the Statutes of 1795 the law establishing the office of comptroller was continued in force by legislative acts passed from time to time. In the Statutes of 1795 the act of 1788 was repeated with little change of language, and the limitation that it continue in force only for two years was included; Statutes, 1795, p. 117; and the law of 1789 above quoted was also repeated with a slight addition. Statutes, 1795, p. 420. At the May session of the General Assembly in 1796, an act was passed continuing the law concerning the comptroller during the pleasure of the General Assembly. Ms., State Rec. (Vol. 5) May Session, 1796, p. 13. The Statutes of 1808 repeat the act of 1796, continuing the act establishing the office, and the act of 1789 was repeated in extenso. Statutes, 1808, pp. 190, 655. In chapter 20 of the Public Acts passed at the October session, 1812, it was provided that all accounts payable from the treasury of the state for the support of the poor should be "liquidated and adjusted" by the comptroller, who was to draw on the treasurer for such sums as he found justly due. In another act passed in 1817, the comptroller was

required annually to "return" to the General Assembly an abstract of the receipts and expenditures of public funds. Public Acts, May session, 1817, Chap. 8. One other act affecting the duties of the comptroller was passed between 1808 and 1818, but it is not material to our inquiry. Public Acts, October session, 1817, Chap. 7.

After the establishment of the office of comptroller, payment of expenses of the state continued generally to be made in the four ways which have been described, except that the comptroller took the place formerly occupied by the pay-table committee. In the resolutions falling within the fourth class there continued to be a variance in the particular words used: liquidate and settle; decide on and settle; liquidate; examine and approve; examine and adjust; examine and settle; compute upon a certain basis; but "settle" or "adjust" were used more often than the others we have mentioned, and the words "settle and adjust" most frequently of all.

In *State* v. *Staub,* 61 Conn. 553, 568, 23 A. 924, we discussed the words "adjust and settle" as used of the duty of the comptroller stated in § 19 of article fourth of the constitution, and we said that as to unliquidated claims it was his duty to determine what is due, and as to a claim which was "liquidated in the sense that its amount is fixed by operation of law" he has no other duty than to draw his order in payment of it. This we said was a ministerial act and, where the statutes directed him to distribute among the towns a definite sum for every person of school age, we held that he could be compelled to do so by mandamus even in the absence of a specific appropriation. In the course of our discussion we said: "The word 'settle,' when applied to a liqui-

dated account or demand, means to pay it." At the time that opinion was written our state records, which begin with the session of the General Assembly held in October, 1776, had not been printed or indexed and consequently most of the material to which we have referred was not easily available. Our examination of the records makes it clear that the words "settle and adjust" are used to denote a single thought; that they mean no more, when used in this article of the constitution, than that the comptroller is to fix the amount due a claimant or claimants, and that they do not in themselves carry any connotation of payment. This is definitely shown by the almost invariable practice of annexing to an order that the comptroller settle and adjust a claim, which, as we have said, was usually called an "account," a further direction that he draw an order upon the treasurer for its payment. In the constitution this direction was omitted, and the matter of payment was left for determination by the General Assembly. In the Revision of 1821 (p. 461) it was provided: "It shall be the duty of the comptroller, upon the settlement of any claim or demand against the state, to draw an order on the treasurer for the payment thereof, in favor of the person or persons entitled to receive the same"; and this provision has, in effect, ever since continued as a part of our law. General Statutes, § 126.

Our examination of the records serves also to make clear the meaning of the words, in the constitutional provision we are considering, "except grants and orders of the General Assembly." The word "grants," no doubt, was intended to refer to actions by the General Assembly, which used that word, or some equivalent, usually without any direc-

tion to the treasurer to pay the amounts specified, as, e. g., "Granted to His Excellency Oliver Wolcott, Esquire, six hundred dollars, for the last half of his salary, as Governour of this State the current year." Ms., State Rec. (Vol. 12) October session, 1817, p. 60. The word "orders" was intended to include directions by the General Assembly to the treasurer to pay, or to the comptroller to draw orders upon him for the payment of, sums which were either specified in the resolution containing the direction or in the "memorial" in response to which the resolution was passed or were capable of definite ascertainment by reference to some existing document. In a number of instances, however, previous to the adoption of the constitution, the amounts to be paid were left to the determination of special committees or designated officials. See, e. g., 15 Col. Rec. 36, 318; 3 State Rec. 190; 5 State Rec. pp. 55, 74, 424. While in most instances the payments were made for the personal use of the person who received the money, during the War of the Revolution and in the following years many resolutions were passed directing the treasurer to pay, or the committee of the paytable to draw orders for the payment of, money to military officers to be distributed by them to those in service entitled to compensation, and in a few instances similar orders were made in favor of persons other than military officers; see, e. g., 15 Col. Rec. 16, 32; 5 State Rec. 283; Ms., State Rec. (Vol. 10) May Session, 1812, p. 80; and we have no doubt that such directions are within the meaning of the words "orders of the General Assembly." The "orders" so designated are distinguishable from the claims which the comptroller was to "settle and adjust" by the fact that the amounts to be paid were

fixed by the Assembly directly or by reference to some source from which they could be definitely ascertained.

In the light of precedent legislative action, we cannot read the provision we are considering as precluding the General Assembly from ordering the treasurer to pay, or the comptroller to draw orders upon him for the payment of, amounts to be fixed by some other official or officials. That this was the contemporary understanding of this provision of the constitution appears from the fact that the act of 1789 concerning payments of orders by the treasurer, which we have quoted, was substantially repeated in the Revision of 1821, and under its terms the treasurer was authorized to "pay out of the public monies in his hands" not only upon orders of the General Assembly or either house thereof but also upon orders of the Supreme Court of Errors, the Superior Court and County Courts "when warranted by express law," as well as upon orders of the comptroller "for accounts liquidated and adjusted by him." Rev. 1821, p. 462. The act before us might have taken the form of a direction to the treasurer to pay from the benefit account such sums as the administrator might find to be due to persons entitled to benefits, and, had it done so, it would not have been invalid as an unconstitutional invasion of the functions of the comptroller specified in § 19 of article fourth of the constitution. This was its actual effect and that it was differently phrased cannot produce a contrary result. We cannot read § 19 of article fourth of the constitution as precluding the General Assembly from so providing.

The remaining question is as to the effect of the provision in § 17 of article fourth of the constitution

that the treasurer "shall pay no warrant, or order for the disbursement of public money, until the same has been registered in the office of the Controller." The words "warrant, or order" in this provision undoubtedly mean a written request or direction issued by some authorized person to the treasurer that he pay a specified sum of money from the public moneys in his possession to a designated person or persons. The words would not include directions to the treasurer as to the disposition of money in his hands made in a public act defining his duties. They would, however, include an act passed by the General Assembly which directed the treasurer to pay a sum of money to a designated person; such an act would be a special law, which, until 1911, took the form of a resolution; Rev. 1902, § 18; Public Acts, 1911, p. 1609, Chap. 297; see *Water Commissioners* v. *Curtis,* 87 Conn. 506, 508, 89 A. 189; and so it would fall directly within the meaning of "orders" as used before and at the time of the adoption of the constitution. The requirement would, of course, apply to all written directions issued by some authorized officer to the treasurer requesting or ordering him to pay money to a designated person or persons.

When, under the act before us, the treasurer has requisitioned such amount as the administrator directs from the unemployment trust fund in the possession of the treasurer of the United States, he is required to deposit it in "the benefit account of the unemployment compensation fund." The unemployment compensation fund, including the benefit account, is, under the act, at all times in the state treasury. When the administrator makes withdrawals for the purpose of paying benefits, he is making

an order upon the treasurer. Such an order falls within the requirement of § 17 of article fourth of the constitution that the treasurer shall pay no warrant or order until it has been registered in the office of the comptroller. While § 969h does not require such registry, the provision in § 126 of the General Statutes that the comptroller "shall register all warrants or orders for the disbursement of the public money" applies, and the want of a specific requirement of registry in § 969h does not make the law invalid.

The genesis of this provision was undoubtedly the requirement in the act of 1786 which we have outlined above and which was repeated in the Statutes of 1808 (p. 190) as follows: ". . . no orders hereafter to be drawn upon the treasurer, shall be paid, until the same shall be entered on the controller's books, and a certificate of such entry shall by him be endorsed on such orders." This provision was substantially re-enacted in the Revision of 1821 (p. 462) in these words: ". . . no order, not drawn by the comptroller, shall be paid, unless registered in the books of the comptroller, and a certificate of such entry endorsed thereon"; and it continued to be our law until the Revision of 1930, except that in the Revision of 1875 the concluding clause was abbreviated to read "and such registry certified thereon." Rev. 1866, p. 686; Rev. 1875, p. 8; Rev. 1918, § 95. In the Revision of 1930 the requirement that the registry of orders in the comptroller's office be certified upon them was omitted. General Statutes, §§ 83, 126. As the statutes impose no duty upon the comptroller to inform the treasurer that an order has been registered, nor upon the treasurer, when presented with an order which bears no evidence of

having been so registered, to cause it to be presented in the comptroller's office, the person seeking payment or some person in his behalf must see that it is so presented. It is necessarily implied in the constitutional provision that the comptroller, having registered it, will, by indorsement upon it or otherwise, furnish such evidence of that registry as will permit the treasurer to pay it. The failure of the constitution or the statutes specifically to provide that this shall be done does not render the provision ineffective.

Because this action involves the duties imposed by the constitution upon the treasurer and the comptroller, because the argument before us was much broader in scope than a strict adherence to the questions asked in the reservation would require, and because our decision will necessarily affect the conduct of several governmental agencies other than the administrator of the Unemployment Compensation Act, we have dealt somewhat at large with the constitutional provisions involved.

To question (a) in the reservation asking whether the provisions quoted at the beginning of this opinion from § 969h of the 1945 Supplement to the General Statutes divest the treasurer and the comptroller of duties imposed upon them by the constitution, we answer "No," but we point out that orders by the administrator for the withdrawal of funds from the benefit account must be registered in the office of the comptroller in accordance with § 126 of the General Statutes. The other questions asked require no answer.

No costs will be taxed in this court to any party.

In this opinion the other judges concurred.