The CONNECTICUT JUDICIAL SELECTION COMMISSION and Martha Connolly, Robert M. Hadley, Robert F. Harrel, Jr., Jeanne J. Hogan and William Nahas, as rightful non-attorney-at-law members of the Connecticut Judicial Selection Commission, and individually, Plaintiffs,

v.

John B. LARSON, President Pro Tempore of the Connecticut Senate, Richard J. Balducci, Speaker of the Connecticut House of Representatives, Cornelius O'Leary, Senate Majority Leader, Robert F. Frankel, House of Representatives Majority Leader, Reginald J. Smith, Senate Majority Leader, and Robert Jaekle, House of Representatives Minority Leader, in their capacity as persons designated to appoint members of the Connecticut Judicial Selection Commission purportedly pursuant to Connecticut Public Act Section 89–238, Ray Bastarache, E. Clayton Gengras, Jr., John G. Groppo, James Spellman, John Doe 1 purported non-attorney-at-law members of the Connecticut Judicial Selection Commission, all individually and in their official capacity, Defendants.

Civ. No. H–89–610 (JAC).

United States District Court,
D. Connecticut.

Dec. 6, 1989.

---

14. *See,* Amended order No. 242 filed on May 11, 1990 docket No. 14575.

Jacob D. Zeldes, David P. Atkins, Carol Joy Gordon, Zeldes, Needle & Cooper, P.C., Bridgeport, Conn., for plaintiffs.

Clarine Nardi Riddle, Atty. Gen., State of Conn., Charles A. Overend, William J. McCullough, Lori Adler, Asst. Attys. Gen., State of Conn., Hartford, Conn., for defendants.

RULING ON MOTION TO DISMISS

JOSÉ A. CABRANES, District Judge:

*Introduction*

Plaintiffs, an agency of the State of Connecticut and its five non-attorney members,[1] brought this suit on September 20, 1989, seeking relief from Public Act No. 89–238 (the "Act"), which makes changes in the procedures and composition of the Connecticut Judicial Selection Commission (the "Commission"). Those changes include shortening the terms of the Commission's non-attorney members so that they ended on September 30, 1989, instead of November 19, 1992. Defendants include the replacements named to the Commission's non-attorney membership positions as of October 1, 1989, as well as the leaders

---

1. Although the Commission has six non-attorney members, the sixth, Zena Temkin, has resigned and is not a party to this suit.

of the General Assembly, who are charged by the Act with the appointment of replacements for the non-attorney members.

The original complaint claimed that the Act violates Article 1, Section 10 of the United States Constitution because it is a bill of attainder,[2] aimed at punishing a clearly identifiable group. That complaint also alleged violations of Connecticut common law, as stated in *State ex rel. Birdsey v. Baldwin*, 45 Conn. 134 (1877), and of the twenty-fifth amendment of the Connecticut Constitution (the "Amendment").[3] An Amended Complaint (filed Oct. 10, 1989) added the claim that the Act violates the Fourteenth Amendment of the United States Constitution[4] and 42 U.S.C. § 1983 ("§ 1983")[5] by depriving the individual plaintiffs of a property right in their office without due process of law.

Oral argument on defendants' Motion to Dismiss (filed Oct. 4, 1989) was heard on October 31, 1989. On the basis of that argument and the full record in this case, I am persuaded that (1) plaintiffs do not lack standing or competence to assert these claims, (2) the due process claim does not present a "substantial federal question" and so does not fall within the jurisdiction of this court,[6] and (3) the bill of attainder claim, the only claim over which this court has jurisdiction, is without merit. Therefore, for the reasons set forth below, defendants' motion to dismiss is granted.

2. "No State shall ... pass any Bill of Attainder...."

3. *See* note 8, *infra*, and accompanying text (text of amendment).

4. The Fourteenth Amendment provides, in pertinent part, that "[no] State [shall] deprive any person of life, liberty, or property, without due process of law...."

5. Section 1983 provides, in pertinent part, that "[e]very person who, under color of any [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

## I. *Facts*

The Commission was created by a two step process. First, on July 12, 1985, the General Assembly adopted enabling legislation for the Commission, Connecticut Public Act 85–586 ("the Original Act"),[7] which would take effect upon the official certification of the adoption by the electorate of the proposed Amendment. Second, the Amendment was adopted by the citizens of Connecticut on November 4, 1986 and went into effect on November 19, 1986. The Original Act went into effect on this latter date, in accordance with its terms.

The Amendment provides, in pertinent part, that "[j]udges of all courts, except those courts to which judges are elected, shall be nominated by the governor exclusively from candidates submitted by the judicial selection commission."[8] The Original Act provided, *inter alia*, that each of the twelve commissioners—six non-attorneys chosen by the legislative leadership and six attorneys chosen by the governor— would serve six-year terms.[9] It also required that the Commission's activities would be confidential.[10]

Plaintiffs contend that by passing the Amendment and the Act, "Connecticut joined a growing number of jurisdictions in adopting a system of merit selection of judges." Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction (filed Sept. 28, 1989) at 2. They also

6. 13B Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 2d*, § 3564 (1988 & Supp.1989) (collecting authorities).

7. Public Act 85–586 was codified as § 51–44a of the Connecticut General Statutes.

8. The remainder of the Amendment provides: "The commission shall seek and recommend qualified candidates in such numbers as shall by law be prescribed. Judges so nominated shall be appointed by the general assembly in such manner as shall by law be prescribed. They shall hold their offices for the term of eight years, but may be removed by impeachment. The governor shall also remove them on the address of two-thirds of each house of the general assembly and the supreme court may also remove them as provided by law."

9. The Original Act, §§ 1(b) and (d).

10. The Original Act, § 1(i).

claim that the provisions of the Original Act were intended "to assure the independence of the Commission," *id.* at 4, and were effectively incorporated into the Amendment. They argue that because the Original Act set the stage for the referendum on the Amendment, the voters acted on the Amendment with an effective knowledge of the terms of the Original Act.

Members of the Commission were appointed in accordance with the Original Act. Plaintiffs assert in their complaint and in their arguments to the court that the Commission failed to nominate as judges and workers' compensation commissioners individuals endorsed or supported by political leaders and that the Act was adopted in 1989 in retaliation for the Commission's failure to nominate those candidates. *See* Amended Complaint at ¶ 10.

The Act became effective on its passage on June 22, 1989. It repealed the Original Act, while simultaneously reenacting most of its provisions. However, it contained several significant changes. The Act provided that the terms of non-attorney members would expire on September 30, 1989, instead of November 19, 1992. Unlike future Commission members, the non-attorney members whose terms were thus abbreviated were explicitly made eligible for reappointment.[11]

The Act also (1) shortens the term of all Commission members from six years to three years, except for incumbent attorney members; (2) mandates that Commission votes on the qualification of new nominees (as opposed to incumbent judges) not be by secret ballot, as had been the practice for all Commission votes in the past;[12] (3) requires that the Commission adopt regulations pursuant to the Uniform Administrative Procedure Act; and (4) provides that the majority leaders of the Senate and House of Representatives shall each appoint one member of the Commission and that the President Pro Tempore of the Senate and Speaker of the House shall each appoint one, rather than two, members of the Commission.

Defendants argue that plaintiffs lack standing, that this case does not present a substantial federal question, and that plaintiffs' substantive claims must fail as a matter of law. I will consider each argument in turn.

## II. *Standing*

Defendants allege defects in the "standing" of both the Commission and the individual plaintiffs.

### A. The Commission's Authority to Sue

■ Defendants first argue generally that the Commission is nowhere specifically empowered to sue and that "[w]hat the [Commission] and its members are attempting to do here is confer upon themselves a power that they do not have, act beyond their constitutional and statutory authority, and modify the provisions granting the Commission its powers." Memorandum of Law in Support of Defendants' Motion to Dismiss (filed Oct. 4, 1989) ("Defendants' Memorandum") at 6. However, the cases on which defendants rely for that proposition are irrelevant since they deal with agencies entirely the creatures of the legislature. Whatever its exact degree of independence, the existence of the Commission is required by the Connecticut Constitution.

That the Commission is not specifically authorized to bring this suit is not relevant as long as the basic requirements of standing have been met:

> Standing is not a technical rule.... Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy with each view fairly and vigorously represented. These two objectives are ordinarily held to have been met when a complain-

---

**11.** The Act, § 1(d)(2). In fact, Robert F. Harrel, Jr., one of the individual plaintiffs, has been reappointed.

**12.** This change does not make the vote *public*, it merely eliminates secret balloting within the commission itself.

ant makes a colorable claim of direct injury. . . .

*Maloney v. Pac,* 183 Conn. 313, 320–21, 439 A.2d 349, 353–54 (1981) (citations omitted); *see also Flast v. Cohen,* 392 U.S. 83, 98–99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Here all plaintiffs have clearly made such colorable claims, *cf. Board of Pardons v. Freedom of Information Comm'n,* 210 Conn. 646, 650, 556 A.2d 1020, 1022 (1989) (Board has "institutional interest in the integrity of its decision-making process[,]" and therefore standing to seek relief against another state agency), and the absence of express authorization is no bar. *Dowe v. Egan,* 133 Conn. 112, 48 A.2d 735 (1946) (comptroller sought declaratory judgment without any express authority).

B. The Statutory Requirement that the Attorney General Represent Plaintiffs

■ Defendants argue more specifically that C.G.S. § 3–125 ("§ 3–125") requires that only the Attorney General of the State of Connecticut may act as counsel in bringing this action on behalf of the Commission and its members in their individual capacities. Defendants' Memorandum at 7–8. On its face, § 3–125 does not apply to the Commission. The section's requirement that "[a]ll suits or other proceedings by such officers shall be brought by the attorney general or under his direction" arguably applies to the Commission's members.[13] However, defendants draw to the court's attention no case in which an action has been dismissed because a plaintiff was not represented by the Attorney General. Defendants' Brief 7–8. Further, plaintiff persuasively points out that there even have been suits between state officials in which *neither* side was represented by the

attorney general. *See, e.g., Eielson v. Parker,* 179 Conn. 552, 427 A.2d 814 (1980) (Connecticut judges suing treasurer and comptroller).[14] Therefore, I find that § 3–125 does not bar the Commission and its members in their official capacities from bringing this suit when represented by counsel other than the Attorney General.

C. The State Suing "Itself"

■ Defendants also contend that "[a]ll plaintiffs and *all* defendants, therefore, are state agencies, state officials, or individuals acting in an official state capacity. . . . Thus, this is a suit by the state against the state . . . and . . . the state has no authority to sue itself." Defendants' Memorandum at 9.[15] As with defendants' contention that the Commission lacks authority to sue, this argument depends upon the mistaken assumption that the Commission is solely a creature of the legislature; in this instance, defendants draw an analogy to the inability of municipalities to "sue their creators." *See* Defendants' Memorandum at 8–11. This court need not explore in detail the special (and constitutional) status of the Commission, in order to conclude that it does not stand on the same footing as a municipal corporation. Plaintiffs correctly point out that state officials have sued each other in the past. *See, e.g., Dowe v. Egan,* 133 Conn. 112, 48 A.2d 735 (1946) (comptroller sued commissioner of labor for declaratory judgment) *discussed in* Brief for Plaintiffs in Opposition to Defendants' Motion to Dismiss (filed Oct. 10, 1989) ("Plaintiffs' Brief") at 10, 14. For the same reasons defendants also argue that this is not a justiciable case or controversy, because

---

13. "[S]uch officers" refers to "the governor, the lieutenant governor, the secretary, the treasurer and the comptroller, and for all heads of departments and state boards, commissioners, agents, inspectors, committees, auditors, chemists, directors, harbor masters, high sheriffs and their chief deputies . . . and institutions and for the state librarian. . . ." Plaintiffs make the perfectly plausible, but unsupported, assertion that when § 3–125 was adopted in 1902, "commissioners" referred only to the heads of state departments, and they note that there is no persuasive evidence that § 3–125 was intended to cover the Commission or its members. *See*

Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss (filed Oct. 10, 1989) at 7. However, the precise scope of § 3–125 is not critical to my decision.

14. The court is not aware of any case in which a Connecticut court found that § 3–125 requires representation only by the Attorney General.

15. This argument was made before the amended complaint was filed, adding the member plaintiffs in their individual capacity and obviously is addressed only to the Commission and its members in their official capacity.

"the state is not adverse to itself." Defendants' Memorandum at 12. That argument borders on the frivolous. Whatever the merits of these plaintiffs' claims, they do not fail for want of an *"actual* controversy between *adverse* litigants." Defendants' Memorandum at 12.

### III. *Subject Matter Jurisdiction: Substantial Federal Question*

■ Finally, defendants contend that both the Commission and the individual plaintiffs lack "standing" because this case does not raise "a substantial federal question." Defendants' Memorandum at 12–15. Defendants claim that the power of the legislature over bodies such as the Commission is so well established that any challenge should be dismissed as "insubstantial."

> It is well established that
>
> the federal courts are without power to entertain claims otherwise within their jurisdiction if they are so attenuated and unsubstantial as to be absolutely devoid of merit[.] ... [T]he question may be plainly unsubstantial, either because it is obviously without merit or because its unsoundness so clearly results from the previous decisions of this Court as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy.

*Hagans v. Lavine,* 415 U.S. 528, 536–37, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577 (1974) (citations and quotation marks omitted).[16] We do well to recall that "[t]he requirement of substantiality does not refer to the value of the interests that are at stake but to whether there is any legal substance to the position the plaintiff is presenting." 13B Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction 2d,* § 3564 (1988 & Supp.1989).

Changing, or even abolishing, offices is clearly a prerogative of a legislature. Fifty years ago, the Supreme Court noted "the familiar principle that the legislative power of a State, except so far as restrained by its own constitution, is at all times absolute with respect to all offices within its reach. It may at pleasure create or abolish them, or modify their duties. *It may also shorten or lengthen the term of service." Higginbotham v. Baton Rouge,* 306 U.S. 535, 538, 59 S.Ct. 705, 706, 83 L.Ed. 968 (1939) (citations omitted; emphasis added). In that case, the Court found that a legislature's ability to alter state offices was so well established that an officeholder's claim that his removal violated the contract clause of the Constitution was frivolous.

More recently, due process and § 1983 claims to government offices also were found not to raise a substantial federal question. *Goldsmith v. Mayor and City Council of Baltimore,* 845 F.2d 61, 65 (4th Cir.1988) ("The Supreme Court has ruled time and time again that, under the federal constitution, a legislative body ... has the unfettered authority to create, alter and abolish such positions."); *see also Dupont v. Kember,* 501 F.Supp. 1081, 1085 (M.D. La.1980) (dismissing § 1983 claim) ("No provision of the federal Constitution imposes restraints upon a state legislature regarding creation, alteration or abolition of state offices.")

*Higginbotham* and *Goldsmith* dispose of plaintiffs' due process and § 1983 claims. The language quoted above from *Higginbotham* is particularly apt. Plaintiffs claim that these precedents are inapplicable to their due process claims because Connecticut common law and the Connecticut Constitution create an additional property entitlement, independent of statute. Plaintiffs' Brief at 16–17. However, the Connecticut Constitution provides only for the existence of the Commission and no claim is made here that the Act actually abolishes the Commission; therefore, the distinction urged by the plaintiffs is without merit. In sum, because plaintiffs'

---

**16.** *See also* 13B Wright, Miller & Cooper, *supra* note 6, § 3564 at 66–67 (1988 & Supp.1989) (footnote omitted). ("Not every case 'arising under' federal law is within federal question jurisdiction. The federal claim must be a 'substantial' one."); *Crowley Cutlery Co. v. United States,* 849 F.2d 273, 276 (7th Cir.1988).

claim of deprivation of property without due process of law does not present a substantial federal question, this court lacks subject matter jurisdiction over it.

It may be argued that plaintiffs' bill of attainder claim should also be dismissed for lack of subject matter jurisdiction, on the same grounds. Nonetheless, I will assume for the argument that the bill of attainder claim is not so clearly covered by past cases as to be deemed "unsubstantial" and that the close relationship of the bill of attainder and due process claims makes it prudent that I consider the merits of both.

### IV. *Standard for Dismissal*

In ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), the court assumes all factual allegations of the complaint to be true and makes all reasonable inferences in favor of the opposing party. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1959) (footnote omitted); *see, e.g., Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir.1985). This standard governs actions under § 1983. *See Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983).

### V. *Plaintiffs' Federal Claims*

Both of plaintiffs' constitutional claims—that the Act is a bill of attainder and that the Act deprives them of property without due process of law—are substantially similar. The individual plaintiffs maintain that the legislature took action against them which was so particularized that it could only legitimately be taken by the judiciary. Upon careful examination, the crux of plaintiffs' due process claim is that the Act's effects are too particularized to be accomplished by legislative rulemaking and require the safeguards of judicial process.

"[T]he case for due process protection grows stronger as the identity of the persons affected by a governmental choice becomes clearer; and the case becomes stronger still as the precise nature of the effect on each individual comes more determinately within the decision-maker's purview." L. Tribe, *American Constitutional Law*, § 10–7, at 667 (2d ed. 1988).

The same may be said for plaintiff's bill of attainder claim. "[The Framers'] writings ... demonstrate that the bill of attainder clause was intended to be a broad implementation of the separation of powers, a general safeguard against the combination of the legislative and adjudicatory powers, or more simply—trial by legislature." Note, "The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause," 72 Yale L.J. 330, 342–43 (1962).[17]

### A. Bill of Attainder

■ In Count One, each plaintiff claims that the Act is a bill of attainder. Such a claim is appropriately raised under the Bill of Attainder Clause of the Constitution. As the Supreme Court noted in *United States v. Brown*, 381 U.S. 437, 442, 85 S.Ct. 1707, 1711–12, 14 L.Ed.2d 484 (1965), "the Bill of Attainder Clause was intended not as a narrow, technical ... prohibition, but rather as an implementation of the separation of powers, a general safeguard against ... trial by legislature." The cases have developed a definition of bills of attainder with concrete characteristics; the most important of these are that the action be aimed at an identifiable individual or group and that the action be punitive. *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 851, 104 S.Ct. 3348, 3354–55, 82 L.Ed.2d 632 (1984) ("Even if the specificity element were deemed satisfied ... the statute would not necessarily implicate the Bill of Attainder Clause. The proscription against bills of attainder reaches only statutes that inflict punishment....").

---

**17.** *But see* Berger, "Bills of Attainder: A Study of Amendment by the Court," 63 Cornell L.Rev. 355 (1978). "The separation of powers, it is safe to say, was in no way associated by the Framers with the bill of attainder clause." *Id.* at 403.

### 1. Standards for Bills of Attainder

 Legislation with a direct and negative impact on an identifiable individual or group of individuals is not necessarily a bill of attainder. In fact, in *Nixon v. Administrator of Gen. Sers.*, 433 U.S. 425, 472, 97 S.Ct. 2777, 2805, 53 L.Ed.2d 867 (1977), the Supreme Court found that Nixon, the individual named in the legislation, "constituted a legitimate class of one." However, legislation which attempts to speak directly to individuals or particular groups, rather than creating rules of general application, is suspect.[18]

Certain penalties—death, forfeiture, banishment, and exclusion from professions—have historically been associated with bills of attainder. However, past decisions have "looked beyond mere historical experience and [have] applied a functional test of the existence of punishment, analyzing whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Id.* at 475–76, 97 S.Ct. at 2806–07. In addition, the Supreme Court has noted that "our holdings recognize that the severity of a sanction is not determinative of its character as punishment." *Selective Serv. Sys.*, 468 U.S. at 851, 104 S.Ct. at 3354.

The Supreme Court cases on exclusion from professions demonstrate the distinction between punitive legislation and legitimate regulation. After the Civil War, the Court held unconstitutional state laws that attempted to make entry into professions conditional upon disclaiming any past sympathy for the Confederacy. *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866) (licensed professions); *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866) (legal profession). However, bill of attainder challenges to state restrictions rationally related to practicing medicine failed. *Dent v. West Virginia*, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889) (nongraduates of medical schools may be barred); *Hawker v. New York*, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (felons may be barred);[19] *see also Green v. Board of Election*, 380 F.2d 445 (2d Cir.1967) (Friendly, J.) (denying felons franchise is not bill of attainder).

### 2. Plaintiffs' Claim as to Abbreviated Terms

 Although the Act sets up rules that will apply to all future members of the Commission, plaintiffs challenge it on two grounds. First, they note that "[w]hile the individual plaintiffs may serve the same terms as other non-attorney members serve in the future, this does not alter the fact that [particular] non-attorney members were singled out for immediate removal from office." Plaintiffs' Brief at 21.

Plaintiffs' argument that the Act targets them is unpersuasive. Plaintiffs' terms will have been the same as those of their successors (or greater, since their successors will not be eligible for renomination). Those terms are governed by rules of general applicability, rules applied uniformly to everyone filling a certain position or possessing certain characteristics.[20] The fact that the legislature necessarily knows who the Commission's current non-attorney members are is insufficient to prove that the Act is particularized.[21]

Plaintiffs rely on *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed.

---

**18.** *See generally* L. Tribe, *American Constitutional Law*, § 10–4, at 641–50 (2d ed. 1988).

**19.** *See generally* Note, "Beyond Process: A Substantive Rationale for the Bill of Attainder Clause," 70 Va.L.Rev. 475, 480–83 (1984).

**20.** A simple example of a rule of general applicability would be the requirement that all applicants for a drivers license submit to an eye test.

**21.** "[The Bill of Attainder Clause's] application necessarily depends upon the presence of improper *specification* by the legislature of the individuals singled out for punishment. If a law merely designates a properly general characteristic, such as employment in a regulated industry, and then imposes upon all who have that characteristic a prophylactic measure reasonably calculated to achieve a nonpunitive public purpose, no attainder may be said to have resulted from the mere fact that the set of persons having the characteristic might in theory be enumerated in advance and that the set is in principle knowable at the time the law is passed." L. Tribe, *supra* note 18, § 10–4 at 643 (emphasis in original).

1252 (1945), for the proposition that effective removal from office by legislative act is necessarily punitive. However, the facts of *Lovett* differ dramatically from this one. As the Court there aptly observed, "[w]hat is involved [in *Lovett*] is a congressional proscription of Lovett, Watson, and Dodd, prohibiting their ever holding a government job." *Id.* at 314, 66 S.Ct. at 1078. In contrast, the individual plaintiffs are not barred from government employment, or from any particular government job. In fact, unlike other Commission members, plaintiffs are specifically made eligible for appointment to a second term on the Commission—and, indeed, one of them (Robert F. Harrel, Jr.) has been reappointed.

Plaintiffs also rely on *Crain v. City of Mountain Home*, 611 F.2d 726 (8th Cir. 1979), in which city council ordinances effectively removing the City Attorney from office were found to be bills of attainder. However, both of those ordinances are readily distinguishable from the Act. The first ordinance named Crain and expressly removed him from office. There was no change in the term of his office and no indication that future City Attorneys would be limited to similarly abbreviated terms. This contrasts sharply with the general rules found in the Act. The second ordinance reduced the City Attorney's salary and prohibited him from engaging in the private practice of law. While these were arguably rules of general application, the *Crain* court found them to be punitive and to be clearly directed at one person. It decided that the city council's cost-saving rationale was "belied by the council's own actions." *Id.* at 729. While plaintiffs in the instant case claim that the legislature's attempts to gain greater control of the Commission are forbidden under Connecticut law, they do not claim that they are irrational or intended to mask persecution of the individual plaintiffs. In short, "[i]t is clear that general legislation such as this ... aimed at the office ... rather than the incumbent office holders, has none of the objectionable attributes of a bill of attainder." *Lanza v. Wagner*, 11 N.Y.2d 317,

229 N.Y.S.2d 380, 385–86, 183 N.E.2d 670, 674, *appeal dismissed*, 371 U.S. 74, 83 S.Ct. 177, 9 L.Ed.2d 163, *cert. denied*, 371 U.S. 901, 83 S.Ct. 205, 9 L.Ed.2d 164 (1962).

### 3. *Plaintiffs' Claim as to Rule Changes*

■ Plaintiffs' second contention is "that individual non-attorney members and the Commission suffer ... from a loss of independence as a result of [several of the Act's provisions], which provisions are clearly designed to discourage 'future conduct.'" Plaintiffs' Brief at 21 (citation omitted). Specifically, the Act requires that the Commission's votes on non-judges seeking appointment to judgeships no longer be by secret ballot and that the Commission adopt regulations pursuant to the Uniform Administrative Procedure Act.

On its face, this claim lacks even a pretense to the targeting of individuals forbidden by the Bill of Attainder Clause. The effect of the rule changes will be the same on all future Commission members, and plaintiffs cannot claim that they are disadvantaged any more than their successors will be.

Nor are these rule changes punitive. It is true, of course, that "[p]unishment is not limited solely to retribution for past events, but may involve deprivations inflicted to deter future misconduct." *Selective Serv. Sys.*, 468 U.S. at 851–52, 104 S.Ct. at 3355. However, plaintiffs take this statement out of context. Bills of attainder are forbidden because they, unlike legitimate rules of general application, are aimed at individuals or groups of individuals. The relevant inquiry, then, is whether the rule changes are aimed at modifying or determining the future conduct of the individual plaintiffs, not whether they are aimed at modifying the future conduct of all individuals who may happen to be members of the Commission. The rule changes here clearly speak to all of the Commission's members, present and future, rather than to these particular plaintiffs.

## B. Due Process

In Count Two, the individual plaintiffs claim that they have property interests in their memberships on the Commission and that they are deprived of these memberships by the Act without due process of law. For the reasons already stated, this court is without jurisdiction to decide that issue because it does not present a substantial federal question. Assuming for the argument only that this court does have jurisdiction to decide the due process claim, I turn to the merits of that claim.

### 1. *Property Interest*

■ Plaintiffs do not have a property interest in their memberships on the Commission. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.... Property interests ... are defined by existing rules or understandings that stem from an independent source such as state law...." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The Act changes Connecticut law so that plaintiffs' terms expired on September 30, 1989. Therefore, in order to show that they have a continued entitlement to these offices, plaintiffs must prove the Act invalid as a matter of state law.

Plaintiffs' claim that the Act is invalid is based on *State ex rel. Birdsey v. Baldwin,* 45 Conn. 134 (1877), and the twenty-fifth amendment to the Connecticut Constitution. This claim is unpersuasive.

*Birdsey* does not stand, as plaintiffs argue, for the broad proposition that the General Assembly may not shorten terms of public officials by legislation. Such broad claims were made by the plaintiffs in *Birdsey* and explicitly rejected by the Supreme Court of Errors:

> It is claimed by the [plaintiffs] that the act is unconstitutional and void, on the ground that the legislature in removing [them] assumed the powers of the judicial department of the state government. *We think this claim is not well founded.* It nowhere appears upon the record

that the legislature assumed any judicial functions; no charges were preferred against the [plaintiffs], ... no trial was had, and there was nothing upon which the legislature could have acted in a judicial capacity. The legislature acted only in the discharge of its legislative functions in passing the act under consideration. That it had the constitutional right to pass the act we think is beyond question....

*Id.* at 142 (emphasis added). While the *Birdsey* court upheld the plaintiffs in that case on another ground, they clearly did *not* find that plaintiffs could not be removed from office by operation of a statute abbreviating their terms of office.

The Amendment requires that there be a Judicial Selection Commission, but it nowhere speaks of its membership or rules. Plaintiffs argue that since the Original Act was passed before the Amendment's ratification, its terms are effectively "incorporated" into the Amendment. I find it extremely unlikely that either the General Assembly or the voters of Connecticut intended the specific provisions of the Original Act to be accorded constitutional stature. If the legislature had wished to do any such thing, nothing prevented it from making that clear in the Amendment itself. In the absence of any authoritative suggestion to the contrary, I am forced to assume that the Connecticut Constitution means only what it says. Thus, the Amendment does not prohibit the legislative action at issue here.

### 2. *What Process is Due*

■ Even were I to assume that plaintiffs have property interests in their Commission memberships, I find they were afforded all the process to which they were entitled.

The starting point for any due process analysis must be the presumption that

> [i]n altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates pri-

vate conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements.

*United States v. Locke,* 471 U.S. 84, 108, 105 S.Ct. 1785, 1799, 85 L.Ed.2d 64 (1985) (citations omitted) *see also Connecticut Educ. Ass'n, Inc. v. Tirozzi,* 210 Conn. 286, 298, 554 A.2d 1065, 1071–72 (1989) (in context of legislation, due process is *not* a right to be heard individually, but rather a right to legislative process).

When legislation is alleged to violate the guarantees of due process of law, a proper respect for a state legislature and for our federal system imposes strict limits on the scope of any judicial inquiry. In another context, this court has had occasion to observe that it is not

> the role of the court to substitute its opinion on the merits or desirability of the legislation for that of the legislature which enacted it. It is the role of the court to examine the legislative action merely to determine whether the action was arbitrary and irrational.

*Pineman v. Fallon,* 662 F.Supp. 1311, 1317 (D.Conn.1987), *aff'd,* 842 F.2d 598 (2d Cir.), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 48 (1988). The case law makes it clear that "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).

Under this standard of review, even if the individual plaintiffs could be said to have a property interest in the terms of their original appointments, the orderly and regular passage of legislation adopting rules of general applicability gave them all the process to which they were entitled. Plaintiffs do not even claim that the proper procedures for passage of a Connecticut statute were not followed. They claim only that the *purposes* of the Act are proscribed by the Connecticut Constitution. However, absent a violation of a federal right, this court lacks jurisdiction over that claim.

The enactment of legislation under established norms *is* due process of law, and may legitimately be used to deprive plaintiffs of their alleged "property right" in these offices. Consequently, this court is powerless to inquire further.

## VI. *Pendent State Claims*

Federal courts may exercise pendent jurisdiction over state claims when the state and federal claims derive from a common nucleus of operative fact and are such that the plaintiff ordinarily would be expected to try them all in one judicial proceeding. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). However, pendent jurisdiction is a doctrine of discretion, and where all federal claims are dismissed before trial, the state claims should be dismissed as well. *Id.* at 726.

> When the balance of these factors [judicial economy, convenience, fairness, and comity] indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

*Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 618–19, 98 L.Ed.2d 720 (1988). Accordingly, the state claims are dismissed without prejudice.

## VII. *Conclusion*

For the reasons stated above, defendants' Motion to Dismiss (filed Oct. 4, 1989) is GRANTED.

It is so ordered.